STATE of North Dakota, By and Through its Tax Commissioner, Heidi HEITKAMP, Plaintiff, Appellant and Cross–Appellee,

v.

QUILL CORPORATION, Defendant, Appellee and Cross–Appellant.

Civ. No. 900257.

Supreme Court of North Dakota.

May 7, 1991.

Nicholas J. Spaeth, Atty. Gen., Bismarck, for plaintiff, appellant and cross-appellee. Appearance by Alan H. Friedman, Sp. Asst. Atty. Gen., Los Altos, Cal.

John E. Gaggini (argued), and Don S. Harnack (appearance), McDermott, Will & Emery, Chicago, Ill., and William P. Pearce (appearance), Pearce & Durick, Bismarck, for defendant, appellee and cross-appellant.

VANDE WALLE, Justice.

The State of North Dakota appealed from a district court summary judgment declaring that subsections (6) and (7) of Section 57–40.2–01, N.D.C.C., are unconstitutional as applied to Quill Corporation [Quill], and that the State therefore may not require Quill to collect and remit use tax on its sales to North Dakota consumers. Quill cross-appealed from that part of the summary judgment dismissing its action under 42 U.S.C. § 1983 and denying attorney's fees under 42 U.S.C. § 1988. We hold that Section 57–40.2–01, N.D.C.C., is constitutional as applied to Quill and accordingly we reverse the summary judgment.

I

Quill is a Delaware corporation with offices and warehouses in Illinois, California, and Georgia. Quill sells office supplies, stationery, and equipment, offering over 9,500 different products ranging from paper clips to computers. Its annual sales are in excess of $200,000,000.

Quill solicits business through its numerous catalogs and flyers, advertisements in nationally distributed "card packs," advertisements in national periodicals and trade journals, and telephone solicitation of current customers. Of the more than 200,000 orders Quill receives monthly, approximately one-half are by telephone. The remaining half are received by mail, fax, telex, and by direct computer contact.

Quill's annual sales to nearly 3,500 active [1] North Dakota customers are just under $1,000,000. By sales volume, it is the

---

1. Quill describes an "active" customer as one who has purchased from Quill within the past 24 months.

sixth largest seller of office supplies in North Dakota. Quill each year mails over 60 different catalogs and flyers to its North Dakota customers. This amounts to more than 230,000 separate pieces of mail, weighing over 24 tons, sent into the State annually by Quill.

North Dakota imposes a use tax upon property purchased for storage, use, or consumption within the State. Section 57–40.2–01, N.D.C.C. The rate is equivalent to the corollary sales tax. See Sections 57–39.2–02.1 and 57–40.2–02.1, N.D.C.C. A credit is given if sales or use taxes have been paid to another state upon the same property. Section 57–40.2–11, N.D.C.C.

Although the consumer is ultimately responsible for the tax, a "retailer maintaining a place of business in this state" is required to collect the tax from the consumer and remit it to the State. Section 57–40.2–07, N.D.C.C. Section 57–40.2–01, N.D.C.C., defines "retailer" and "retailer maintaining a place of business in this state":

> "6. 'Retailer' includes every person engaged in the business of selling tangible personal property for use within the meaning of this chapter.... A retailer also includes every person who engages in regular or systematic solicitation of a consumer market in this state by the distribution of catalogs, periodicals, advertising flyers, or other advertising, or by means of print, radio or television media, by mail, telegraphy, telephone, computer data base, cable, optic, microwave, or other communication system.

> "7. 'Retailer maintaining a place of business in this state', or any like term, means any retailer having or maintaining within this state, directly or by a subsidiary, an office, distribution house, sales house, warehouse, or other place of business, or any agent operating within this state.... It also includes every person who engages in regular or systematic solicitation of

sales of tangible personal property in this state by the distribution of catalogs, periodicals, advertising flyers, or other advertising, by means of print, radio or television media, or by mail, telegraphy, telephone, computer data base, cable, optic, microwave, or other communication system for the purpose of effecting retail sales of tangible personal property."

Section 81–04.1–01–03.1(3) of the North Dakota Administrative Code defines "regular or systematic solicitation" as "three or more separate transmittances of any advertisement or advertisements" during a specified twelve-month period.[2]

Quill has refused to collect and remit use taxes on goods purchased and used by Quill's customers in North Dakota. The State, through its Tax Commissioner, commenced this declaratory judgment action under Chapter 32–23, N.D.C.C., seeking a declaration that Quill is a "retailer" and a "retailer maintaining a place of business in this state" which must collect and remit the applicable use tax on its sales to customers in this State.

Quill answered, alleging that Chapter 57–40.2, N.D.C.C., as applied to Quill, is violative of the Due Process Clause and Commerce Clause of the United States Constitution as interpreted in *National Bellas Hess, Inc. v. Department of Revenue,* 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967). Quill filed a counterclaim seeking relief under 42 U.S.C. § 1983 for alleged violations of its Due Process and Commerce Clause rights, and seeking attorney's fees under 42 U.S.C. § 1988.

On cross-motions for summary judgment, the district court held that the State could not constitutionally require Quill to collect and remit use taxes. Relying principally upon *Bellas Hess,* the district court held that the State had failed to establish a sufficient nexus between Quill and the State, and that subsections (6) and (7) of Section 57–40.2–01 were therefore unconsti-

---

2. Section 81–04.1–01–03.1, N.D.A.C., inexplicably states that the definitions therein apply to subsection 5 of Section 57–40.2–01, N.D.C.C. However, the definitions in the Administrative Code section have no logical relationship to subsection 5, and it is therefore apparent that this is an erroneous reference. The parties have not raised this as an issue.

tutional as applied to Quill. The court dismissed Quill's counterclaim seeking relief under 42 U.S.C. §§ 1983 and 1988.

Judgment was entered accordingly and the State appealed. Quill cross-appealed from that part of the judgment dismissing its counterclaim.

## II

### A

Quill concedes that its solicitation of sales in North Dakota meets the statutory and administrative guidelines for a "retailer maintaining a place of business in this state." Thus, the dispositive issue on appeal is whether the State may constitutionally require Quill to collect and remit the use tax.

Any discussion of imposition of the duty of collecting a use tax upon an out-of-state seller must begin with an analysis of *Bellas Hess, supra*. National Bellas Hess was incorporated in Delaware and had its principal place of business in Missouri. Illinois attempted to require National Bellas Hess to collect and remit use tax on mail order sales into that state. The United States Supreme Court summarized the constitutional background:

"National argues that the liabilities which Illinois has thus imposed violate the Due Process Clause of the Fourteenth Amendment and create an unconstitutional burden upon interstate commerce. These two claims are closely related. For the test whether a particular state exaction is such as to invade the exclusive authority of Congress to regulate trade between the States, and the test for a State's compliance with the requirements of due process in this area are similar.... As to the former, the Court has held that 'State taxation falling on interstate commerce * * * can only be justified as designed to make such commerce bear a fair share of the cost of the local government whose protection it enjoys.' ... And in determining whether a state tax falls within the confines of the Due Process Clause, the Court has said that the 'simple but controlling question is whether the state has given anything for which it can ask return.' ... The same principles have been held applicable in determining the power of a State to impose the burdens of collecting use taxes upon interstate sales. Here, too, the Constitution requires 'some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax.' " *Bellas Hess, supra*, 386 U.S. at 756, 87 S.Ct. at 1391, 18 L.Ed.2d at 508–509 (citations omitted).

Characterizing National Bellas Hess as a mail order seller which did "no more than communicate with customers in the State by mail or common carrier," [*Bellas Hess, supra*, 386 U.S. at 758, 87 S.Ct. at 1392, 18 L.Ed.2d at 510], the Court, in a 6–3 decision, held that this connection with Illinois was insufficient to require National Bellas Hess to collect and remit the use tax. The Court drew a "bright line" distinction between mail order sellers whose only connection with its customers in the taxing state was by common carrier or the United States mail and those with more significant connections with the state.

The Court also stressed the substantial administrative burden upon National Bellas Hess if it were required to collect and remit use taxes to numerous jurisdictions. The Court noted that "[t]he many variations in rates of tax, in allowable exemptions, and in administrative and record-keeping requirements could entangle National's interstate business in a virtual welter of complicated obligations to local jurisdictions." *Bellas Hess, supra*, 386 U.S. at 759–760, 87 S.Ct. at 1393, 18 L.Ed.2d at 510 (footnotes omitted).

Justice Fortas, speaking for the dissenters in *Bellas Hess*, formulated a different approach for analyzing the contacts between a taxing state and an out-of-state seller necessary to satisfy Due Process and Commerce Clause requirements. Justice Fortas suggested a more case-specific approach which would take into consideration the nature and extent of the solicitation and exploitation of the state's consumer market:

"There should be no doubt that this large-scale, systematic, continuous solicitation and exploitation of the Illinois consumer market is a sufficient 'nexus' to require Bellas Hess to collect from Illinois customers and to remit the use tax, especially when coupled with the use of the credit resources of residents of Illinois, dependent as that mechanism is upon the State's banking and credit institutions. Bellas Hess is not simply using the facilities of interstate commerce to serve customers in Illinois. It is regularly and continuously engaged in 'exploitation of the consumer market' of Illinois ... by soliciting residents of Illinois who live and work there and have homes and banking connections there, and who, absent the solicitation of Bellas Hess, might buy locally and pay the sales tax to support their State. Bellas Hess could not carry on its business in Illinois, and particularly its substantial credit business, without utilizing Illinois banking and credit facilities." *Bellas Hess, supra,* 386 U.S. at 761–762, 87 S.Ct. at 1394, 18 L.Ed.2d at 511–512 (Fortas, J., dissenting) (citations omitted).

Justice Fortas forecast the rationale for the diminishment of the constitutional significance of "physical presence" in such cases:

"Bellas Hess enjoys the benefits of, and profits from the facilities nurtured by, the State of Illinois as fully as if it were a retail store or maintained salesmen therein. Indeed, if it did either, the benefit that it received from the State of Illinois would be no more than it now has—the ability to make sales of its merchandise, to utilize credit facilities, and to realize a profit; and, at the same time, it would be required to pay additional taxes. Under the present arrangement, it conducts its substantial, regular, and systematic business in Illinois and the State demands only that it collect from its customer-users—and remit to the State—the use tax which is merely equal to the sales tax which resident merchants must collect and remit. To excuse Bellas Hess from this obligation is to burden and penalize retailers located in Illinois who must collect the sales tax from their customers. In Illinois the rate is 3½%, and when it is realized that in some communities the sales tax requires, in effect, that as much as 5% be added to the amount that customers of local, tax-paying stores must pay, the importance of the competitive discrimination becomes apparent. While this advantage to out-of-state sellers is tolerable and a necessary constitutional consequence where the sales are occasional, minor and sporadic and not the result of a calculated, systematic exploitation of the market, it certainly should not be extended to instances where the out-of-state company is engaged in exploiting the local market on a regular, systematic, large-scale basis. In such cases, the difference between the nature of the business conducted by the mail order house and by the local enterprise is not entitled to constitutional significance." *Bellas Hess, supra,* 386 U.S. at 762–763, 87 S.Ct. at 1394–1395, 18 L.Ed.2d at 512 (Fortas, J., dissenting).

The dissent also disputed the extent of the administrative burden which would be placed upon National Bellas Hess, noting that the majority's stated fear of entanglement of interstate commerce "vastly underestimates the skill of contemporary man and his machines." *Bellas Hess, supra,* 386 U.S. at 766, 87 S.Ct. at 1396, 18 L.Ed.2d at 514 (Fortas, J., dissenting). Justice Fortas therefore concluded that neither the Commerce Clause nor the Due Process Clause excused National Bellas Hess from complying with the Illinois use tax statutes.

B

The United States Supreme Court has not revisited this precise issue since 1967. While we necessarily begin our analysis in the context of the majority opinion in *Bellas Hess,* we are mindful that prior cases cannot be read in a vacuum, but must be considered in light of their relevant facts and historical context. See *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (Scalia, J., concurring in

part and dissenting in part). Similarly, appellate review in general is not to be conducted in a vacuum. *Cullen v. Williams County,* 446 N.W.2d 250 (N.D.1989). Appellate judges bring to each case their common sense, ordinary experience, and observation of human affairs. *Cf. Nebraska Press Association v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *Salve Regina College v. Russell,* —— U.S. ——, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991) (Rehnquist, C.J., dissenting); *State v. Olmstead,* 261 N.W.2d 880 (N.D.), *cert. denied,* 436 U.S. 918, 98 S.Ct. 2264, 56 L.Ed.2d 759 (1978).

Quill in effect asks us to accept the notion that the United States Supreme Court will abandon its common sense and experience at the courthouse door and ignore the tremendous social, economic, commercial, and legal innovations since 1967, and blindly apply an obsolescent precedent. We have in the past been chided by the United States Supreme Court for doing just that, and in failing to detect changes in legal course by that Court. See *North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc.,* 414 U.S. 156, 94 S.Ct. 407, 38 L.Ed.2d 379 (1973), *reversing* 202 N.W.2d 140 (N.D.1972). See also, *Snyder's Drug Stores, Inc. v. North Dakota State Board of Pharmacy,* 219 N.W.2d 140 (N.D. 1974) (on remand).[3] We are guided by the maxim that "[w]hen the reason of a rule ceases so should the rule itself." Section 31–11–05(1), N.D.C.C. We have little doubt that maxim has wider application than our state boundaries. As noted by Justice Cardozo, "[t]here should be greater readiness to abandon an untenable position when the rule to be discarded may not reasonably be supposed to have determined the conduct of the litigants, and particularly when in its origin it was the product of institutions or conditions which have gained a new significance or development with the progress of the years." Cardozo, The Nature of the Judicial Process 151 (1921) [*quoted in Kitto v. Minot Park District,* 224 N.W.2d 795, 803 (N.D.1974)].

C

The economic, social, and commercial landscape upon which *Bellas Hess* was premised no longer exists, save perhaps in the fertile imaginations of attorneys representing mail order interests. In the quarter-century which has passed in the interim, "mail order" has grown from a relatively inconsequential market niche into a goliath now more accurately delineated as "direct marketing." The burgeoning technological advances of the 1970's and 1980's have created revolutionary communications abilities and marketing methods which were undreamed of in 1967.[4]

---

**3.** The United States Supreme Court stated that its opinion in an earlier case, upon which we had relied in holding unconstitutional a state statute, was "a derelict in the stream of the law." *North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc., supra,* 414 U.S. at 167, 94 S.Ct. at 414, 38 L.Ed.2d. at 387. Significantly, in overruling its prior case, the Court quoted with approval the dissent in the earlier case. See *North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc., supra;* see also, *Snyder's Drug Stores, Inc. v. North Dakota State Board of Pharmacy, supra,* 219 N.W.2d at 146.

**4.** Anyone with a telephone, television, or mailbox can attest to these modern marketing miracles. When you turn on your television set to one of the myriad of available cable channels, you are likely to see numerous commercials for products, "not available in any store," which must be ordered "before midnight tonight" by dialing the toll-free "800" number on the screen. If the commercials are not enough, you may find yourself watching a thirty-minute "infomercial" hawking items as diverse as cosmetics, car wax, weight loss plans, or cooking utensils. If you are a truly modern consumer, you may turn to one of the 24–hour home shopping channels, available on most cable systems, for a continuous opportunity to buy in the comfort of your living room.

The salesperson who calls on the telephone is likely to be armed with significant background information, including your age, occupation, ages of your children, and your hobbies and buying habits, so that sales calls can be specifically targeted to those customers statistically inclined to purchase certain products. Or, if you prefer, through the wonders of technology you can browse through a computer "catalog," check availability and price of the item you want, and place your order directly through the seller's computer across the country.

The revolution in direct marketing techniques and technology is recounted in Stone, *Direct Marketing: Then and Now, Direct Marketing,* May 1988, p. 38.

Rather than a few full-line mail order retailers essentially offering a "department store by mail," mail order is today marked by literally thousands of specialized catalogs targeted at specific groups of consumers. Technology has triggered this transformation, with computerized database marketing allowing mailings directed to specific demographical groups. In fact, the sale and rental of lists of names of prior or potential mail order purchasers has itself become a three-billion-dollar business.[5] Technology has also changed the method of receiving orders, with the increased efficiency of toll-free telephone lines, fax orders, and direct computer ordering replacing the less-immediate "mail" order, and advances in the parcel delivery industry allow a wide variety of options, including overnight delivery.

Perhaps the greatest change in mail order since 1967 has been in terms of sheer volume. Gone are the days of the Spring and Fall Sears catalog being the definition of mail order. It is estimated that in 1990 13.6 *billion* catalogs were mailed to consumers in the United States, an increase of 7.8 billion in ten years. Over 54 percent of Americans—98 million—made a mail order purchase, an increase of 40 million since 1983.[6] Mail order sales, in the neighborhood of $2.4 billion in 1967 [*see Bellas Hess, supra,* (Fortas, J., dissenting)], reached the staggering figure of $183.3 billion in 1989.[7] By the mid–1980's, mail order accounted for more than 15 percent of total sales nationally. See, e.g., 43 Cong.Q. 2571 (Dec. 7, 1985); Hartman, *Collection of the Use Tax on Out-of-State Mail–Order Sales,* 39 Vand.L.Rev. 993 (1986).

While in 1967 it may have generally been necessary to rely upon in-state sales personnel and inventory to successfully market a product, technology has changed the rules of the game. Today a direct marketer can communicate with his customers across the country through toll-free incoming telephone lines, national WATS telephone service, fax machines, telex, or direct computer communication just as effectively, and more efficiently, than if he were calling personally on each customer. Clearly the direct marketing of the 1990's bears little resemblance to the mail order of the 1960's.

### D

Just as the changes in marketing techniques have affected the economic and commercial landscape since *Bellas Hess,* so too has the legal landscape been altered in that quarter-century.[8] The Supreme Court's expansion of state authority to tax interstate commerce, as well as its broadening of other areas of Due Process and Commerce Clause analysis, leads us to conclude that the foundational basis of *Bellas Hess* has been eroded and that the Supreme Court would so conclude.

Perhaps the most striking shift in the Court's position on taxation of interstate commerce occurred in *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), in which the Court overruled years of precedent and developed a four-prong test to assess Commerce Clause challenges to state taxation of interstate commerce. Prior to that time, Commerce Clause analysis was controlled by the free trade view, as enunciated in *Spector Motor Service v. O'Connor,* 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573 (1951), that direct taxation of interstate commerce was *per se* unconstitutional. See P. Hartman, Federal Limitations on State and Local Taxation §§ 2:16, 2:17 (1981) [hereafter "Hartman, Federal Limitations"]; Recent

---

**5.** *Time,* November 26, 1990, at p. 66.

**6.** These figures are from the Direct Marketing Association, as reported in their special advertising section in the March 14, 1991, edition of USA Today, at pp. 10A–11A.

**7.** See *Time,* November 26, 1990, at p. 63; *Direct Marketing,* July 1990, at p. 30.

**8.** As the Supreme Court noted in *Mobil Oil Corp. v. Commissioner of Taxes of Vermont,* 445 U.S. 425, 443, 100 S.Ct. 1223, 1234, 63 L.Ed.2d 510, 524 (1980), "[t]he effect of the Commerce Clause on state taxation of interstate commerce ... appears to be undergoing a revival of sorts" and "this Court has addressed the issue and has attempted to clarify the apparently conflicting precedents it has spawned."

Developments, *D.H. Holmes Co. v. McNamara: Use Tax on Catalogs Does Not Violate Commerce Clause*, 63 Tul.L.Rev. 407 (1988). Thus, at the time of *Bellas Hess*, Commerce Clause analysis often focused upon whether the challenged tax was levied upon the privilege of doing interstate business or upon some other less-direct incidence of interstate commerce.

The *Spector* doctrine was widely criticized as dependent upon illusory distinctions, legislative labelling, and insubstantial and pointless formalism. Hartman, Federal Limitations, *supra*, at §§ 2:16–2:17; see also, *Complete Auto, supra;* McCray, *Commerce Clause Sanctions Against Taxation on Mail Order Sales: A Re–Evaluation*, 17 Urb.Law. 529 (1985); Recent Developments, 63 Tul.L.Rev. 407, *supra*. The Court, noting that the *Spector* rule "has no relationship to economic realities" and "stands only as a trap for the unwary draftsman," *Complete Auto, supra*, 430 U.S. at 279, 97 S.Ct. at 1079, 51 L.Ed.2d at 331, specifically overruled *Spector* and announced a four-prong test for evaluating Commerce Clause challenges to state taxation. Under the *Complete Auto* formulation, a tax does not violate the Commerce Clause if it (1) is applied to an activity with a substantial nexus with the taxing state, (2) is fairly apportioned, (3) does not discriminate against interstate commerce, and (4) is fairly related to the services provided by the state. *Complete Auto, supra;* see also, *Trinova Corp. v. Michigan Department of Treasury,* — U.S. —, 111 S.Ct. 818, 112 L.Ed.2d 884 (1991); *D.H. Holmes Co. v. McNamara,* 486 U.S. 24, 108 S.Ct. 1619, 100 L.Ed.2d 21 (1988).

One month after deciding *Complete Auto*, the Court expanded the authority of the states to require out-of-state sellers to collect and remit a use tax in *National Geographic Society v. California Board of Equalization*, 430 U.S. 551, 97 S.Ct. 1386, 51 L.Ed.2d 631 (1977). National Geographic sold maps, atlases, globes, and books by mail order to California residents. National Geographic had two offices in California which solicited advertising for its magazine, but which performed no activi-

ties related to the mail order sales. National Geographic challenged California's authority to require collection of use tax on its mail order sales, alleging that there was insufficient nexus between its mail order sales and California.

In prior cases, including *Complete Auto*, the Court had phrased the nexus requirement in terms of the relationship between the taxing state and the *activity* to be taxed. In *National Geographic*, however, the Court expanded the concept of nexus in use tax cases to situations where the out-of-state *seller* has the requisite nexus with the taxing state. Thus, the Court focused upon the benefits and services provided by the state to National Geographic's two advertising offices to support collection of use tax upon its unrelated mail order sales into the state.

In so holding, the Court stressed the distinction between the lesser burdens placed upon the seller by a use tax, which is ultimately borne by the in-state purchaser, and a more direct tax upon the seller:

"Other fairly apportioned, nondiscriminatory direct taxes have also been sustained when the taxes have been shown to be fairly related to the services provided the out-of-state seller by the taxing State. . . .

"The case for the validity of the imposition upon the out-of-state seller enjoying such services of a duty to collect a use tax is even stronger. . . . The out-of-state seller runs no risk of double taxation. The consumer's identification as a resident of the taxing State is self-evident. . . . The out-of-state seller becomes liable for the tax only by failing or refusing to collect the tax from that resident consumer. Thus, the sole burden imposed upon the out-of-state seller by statutes like §§ 6203 and 6204 is the administrative one of collecting it." *National Geographic, supra*, 430 U.S. at 558, 97 S.Ct. at 1391, 51 L.Ed.2d at 638 (citations omitted).

Thus, the Court not only expanded the concept of nexus, but it also recognized the purely administrative nature of the collec-

tion duty in use tax cases and indicated that a lesser showing of nexus may suffice in such cases.

More recently, in a case presenting an interesting twist to the usual use tax situation, the Court upheld imposition of use taxes upon catalogs themselves in *D.H. Holmes Co. v. McNamara, supra.* Holmes, which had thirteen stores in Louisiana, had its catalogs printed out-of-state and mailed from those locations directly to Louisiana customers. The catalogs promoted items available for sale in the local stores, and also could be used to order items by mail. Louisiana sought to collect from Holmes use taxes based upon the value of the catalogs, asserting that they were "used" by Holmes within the state.

The Court applied the *Complete Auto* test and upheld imposition of the tax. Most importantly for our purposes, the Court distinguished *Bellas Hess* in holding that Holmes had sufficient nexus with Louisiana. Although, as the Court noted, there was "'nexus' aplenty" present, *Holmes, supra,* 486 U.S. at 33, 108 S.Ct. at 1624, 100 L.Ed.2d at 29, what is particularly noteworthy is the language employed by the Court to distinguish *Bellas Hess.* Notwithstanding that Holmes was incorporated in Louisiana, had its registered office there, and had thirteen stores with 5,000 employees in the state, the first factor noted by the Court in distinguishing *Bellas Hess* was "Holmes' significant *economic* presence in Louisiana." *Holmes, supra,* 486 U.S. at 33, 108 S.Ct. at 1624, 100 L.Ed.2d at 29 (emphasis added). In a case involving obvious physical presence, we find it significant that the Court chose to stress economic presence, the phraseology of the *Bellas Hess* dissent.

The Court has also discussed the broadening concept of nexus in cases involving constitutional challenges to other taxes upon interstate commerce. For example, in *Standard Pressed Steel Co. v. Washington Department of Revenue,* 419 U.S. 560, 95 S.Ct. 706, 42 L.Ed.2d 719 (1975), a manufacturer of industrial and aerospace fasteners challenged imposition of Washington's business and occupation tax levied upon its unapportioned gross receipts from sales in the state. Standard Pressed Steel's sole connection with the state, other than its interstate sales, was one employee, working from his home in the state, who serviced the company's one large account in the state, the Boeing Company. This employee was a consultant only; he did not take orders on behalf of Standard.

Rather than focusing upon Standard's minimal physical contact with the state through a single employee, and the concomitant minimal benefits and services provided to the company, the Court instead emphasized the connection between the employee's activities and the establishment and continuance of sales to Boeing. In other words, instead of relying upon a bright-line demarcation based upon Standard's physical presence in the taxing state and the receipt of benefits and services, the Court in finding nexus stressed that the employee "made possible the realization and continuance of valuable contractual relations between [Standard] and Boeing" [*Standard Pressed Steel, supra,* 419 U.S. at 562, 95 S.Ct. at 708, 42 L.Ed.2d at 722], and that the employee's "services were substantial 'with relation to the establishment and maintenance of sales, upon which the tax was measured.'" *Standard Pressed Steel, supra,* 419 U.S. at 563, 95 S.Ct. at 709, 42 L.Ed.2d at 723 (*quoting General Motors Corp. v. Washington,* 377 U.S. 436, 447, 84 S.Ct. 1564, 1571, 12 L.Ed.2d 430, 439 (1964), *overruled on other grounds, Tyler Pipe Industries, Inc. v. Washington State Department of Revenue,* 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987)). In so holding, the Court stated that Standard's asserted lack of nexus "verges on the frivolous." *Standard Pressed Steel, supra,* 419 U.S. at 562, 95 S.Ct. at 708, 42 L.Ed.2d at 722.

In *Tyler Pipe, supra,* the Court was again presented with a nexus challenge to the Washington business and occupation tax. Tyler Pipe had one representative soliciting business in state, but, in contrast to *Standard Pressed Steel, supra,* Tyler Pipe's salesman was an independent contractor, not an employee. The Court, relying upon *Scripto, Inc. v. Carson,* 362 U.S.

207, 80 S.Ct. 619, 4 L.Ed.2d 660 (1960), held that the salesman's status as an independent contractor was without constitutional significance. Concluding that the activities of the independent contractor within the state created a sufficient nexus to support imposition of the tax, the Court agreed with the Washington Supreme Court that " 'the crucial factor governing nexus is whether the activities performed in this state on behalf of the taxpayer are significantly associated with the taxpayer's ability to establish and maintain a market in this state for the sales.' " *Tyler Pipe, supra,* 483 U.S. at 250, 107 S.Ct. at 2821, 97 L.Ed.2d at 215–216 (*quoting Tyler Pipe Industries, Inc. v. State,* 105 Wash.2d 318, 323, 715 P.2d 123, 126 (1986)). Thus, in both *Standard Pressed Steel* and *Tyler Pipe,* the Court did not employ a bright-line physical presence test, but instead focused upon the relationship between the out-of-state seller's contacts with the state and its establishment and maintenance of sales within the state.

While the Court has been expanding states' authority to tax interstate commerce, it has also significantly broadened the closely related Due Process analysis in personal jurisdiction cases. In *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472–473, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528, 540–541 (1985), the Court summarized some examples of conduct which will satisfy the minimum contacts requirement and justify assertion of personal jurisdiction over an out-of-state seller:

"Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum ... and the litigation results from alleged injuries that 'arise out of or relate to' those activities.... Thus '[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State' and those prod-

ucts subsequently injure forum consumers.... Similarly, a publisher who distributes magazines in a distant State may fairly be held accountable in that forum for damages resulting there from an allegedly defamatory story.... And with respect to interstate contractual obligations, we have emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities...." (Citations omitted.)

It is clear that Quill has "purposefully directed" its activities at North Dakota residents, has "reach[ed] out ... and create[d] continuing relationships and obligations with citizens" of this State, and has gone beyond placing its products into a general stream of commerce—it has sold and delivered its products directly to North Dakota consumers. It is therefore clear that Quill could, consistent with Due Process, be brought into a North Dakota court to litigate claims arising from those activities.

More significant, however, is the Court's clear recognition that technological advances have made physical presence within the jurisdiction meaningless in modern commerce:

"Jurisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Burger King, supra,* 471

U.S. at 476, 105 S.Ct. at 2184, 85 L.Ed.2d at 543.

The Court also recognized the unfairness which would result if out-of-state sellers were allowed to wholly escape responsibility for the consequences of their actions in other states:

> "Moreover, where individuals 'purposefully derive benefit' from their interstate activities ... it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed. And because 'modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity,' it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity...." *Burger King, supra*, 471 U.S. at 473–474, 105 S.Ct. at 2183, 85 L.Ed.2d at 541 (citations omitted).

### E

In light of these wholesale changes in the social, economic, commercial, and legal arenas, we are required to apply *Bellas Hess* in a contemporary context as we believe the Supreme Court would apply that decision.

The Supreme Court has recently recognized that sweeping technological changes may require corresponding changes in legal doctrine. In *Goldberg v. Sweet*, 488 U.S. 252, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989), Illinois' telecommunications excise tax was challenged on Commerce Clause grounds. After a lengthy discussion of the "explosion in new telecommunications technologies" [*Goldberg, supra*, 488 U.S. at 255, 109 S.Ct. at 585, 102 L.Ed.2d at 613], the Court concluded that "Illinois' method of taxation is a realistic legislative solution to the technology of the present-day telecommunications industry." *Goldberg, supra*, 488 U.S. at 265, 109 S.Ct. at 591, 102 L.Ed.2d at 619. Commenting on prior cases striking down similar state taxes on interstate telecommunications, the Court simply noted that "[t]hese cases considered a telecommunications technology only distantly related to modern telecommunications technology and were decided in a pre-*Complete Auto* era when this Court held the view that interstate commerce itself could not be taxed." *Goldberg, supra*, 488 U.S. at 265 n. 16, 109 S.Ct. at 591 n. 16, 102 L.Ed.2d at 619 n. 16.

Similarly, the Court in *Burger King, supra*, 471 U.S. at 476, 105 S.Ct. at 2184, 85 L.Ed.2d at 543, noted the technological changes which have affected modern commerce: "[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." In *Goldberg* and *Burger King* the Court has recognized that legal theory must be flexible to account for societal changes, and that the vast technological explosion of recent years often requires rethinking of previous doctrine. We therefore are instructed to be cognizant of the vast differences between the mail order of the 1960's and the direct marketing of the 1990's when applying *Bellas Hess* in this case. In addition, the *Bellas Hess* majority specifically characterized the transactions there as being carried out only by mail or common carrier. Very little of the direct marketing of today is limited to mail or common carrier, and the facts of this case clearly demonstrate that Quill's business extended far beyond those limited circumstances.

We also recognize the Court's extensive shift in focus in interstate commerce tax cases. The Court has wholly rewritten the underlying theory in such cases and formulated a new test to measure Commerce Clause challenges. See *Complete Auto, supra*. In *National Geographic, supra*, the Court stressed the administrative nature of the use tax collection requirement and held that a lower threshold of nexus may suffice in use tax cases than in attempts to collect a tax directly from the

out-of-state seller. In *Holmes, supra,* the Court applied the *Complete Auto* test to judge a use tax and noted the seller's significant economic presence within the taxing state to find sufficient nexus and distinguish *Bellas Hess.*

*Complete Auto* and subsequent interstate commerce tax cases have been viewed as an abandonment of the Court's previous formalistic approach in favor of a "more realistic functional calculus" [L. Tribe, American Constitutional Law § 6–15, at 441 (2d ed. 1988)], "grounded in practicality and economic reality" [Recent Developments, 63 Tul.L.Rev. 407, *supra*]. See also, *Trinova Corp. v. Michigan Department of Treasury, supra; Mobil Oil Corp. v. Commissioner of Taxes of Vermont,* 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980). The Court's opinions in *Standard Pressed Steel* and *Tyler Pipe* also demonstrate a greater emphasis upon the economic consequences and realities of the transactions at issue rather than a bright-line physical presence test. Although in each of these cases there was some degree of physical presence within the taxing state, the Court's analysis evinces a retreat from the formalistic constrictions of a stringent physical presence test in favor of a more flexible substantive approach. Accordingly, we believe that a contemporary view of nexus is not dependent upon rigid benchmarks to be applied across the board, but requires a review of the totality of the circumstances, on a case-by-case basis, with special emphasis upon the economic realities presented. See Hartman, *Collection of the Use Tax, supra.* This approach best comports with the Court's current Due Process and Commerce Clause analysis.

We are particularly mindful of the illogical results which can flow from a strict requirement of physical presence within the taxing state in light of the contemporary legal and commercial landscape. For example, a small out-of-state seller with minimal sales in the taxing state solicited through an independent-contractor traveling salesperson would have sufficient nexus to support a duty to collect and remit the use tax [see *Tyler Pipe, supra,* and *Scripto, supra*], yet a mail order leviathan with millions of dollars of annual sales solicited by innumerable catalogs and flyers, and consummated by telephone, fax, telex, or direct computer contact, would be deemed unreachable because it has insufficient nexus with the state. Such a result merely propounds the legal fiction that the fire and police protection provided to one salesperson hawking wares in the state provides a more significant "benefit" than does creating and maintaining a social and commercial climate that enables the out-of-state seller to exploit the state's consumer market to the tune of millions of dollars. See, e.g., Hartman, *Collection of the Use Tax, supra;* Simet, *The Concept of "Nexus" and State Use and Unapportioned Gross Receipts Taxes,* 73 Nw.U.L.Rev. 112 (1978).

The Court's current personal jurisdiction analysis also strongly suggests a retrenchment from physical presence as a benchmark in Due Process analysis. A corporation that merely delivers its product into the stream of commerce with the expectation that it will be purchased by a consumer in another state may be subjected to litigation there [*Burger King, supra*], yet Quill asserts that subjecting it to collection of the use tax, in spite of its continuous, intentional, and massive exploitation of this State's consumer market, would be violative of Due Process. It would be illogical indeed to hold that Quill, which could clearly be haled into a North Dakota court if one of its products injured a North Dakota consumer, could not be saddled with the purely *administrative* burden of collecting a use tax. See *National Geographic, supra.*

Finally, we note the irony in Quill's reliance upon the Due Process Clause and the Commerce Clause in seeking to maintain a tax-free mail order haven and thereby retain an economic advantage over its local competitors.[9] The touchstone of Due Pro-

---

**9.** Empirical studies have demonstrated the effect of the presence or absence of sales or use taxes upon consumer purchasing behavior.

See, e.g., Mowen, Wiener & Young, *Consumer Store Choice and Sales Taxes: Retailing, Public*

cess is fundamental fairness. *Burger King, supra; Bearden v. Georgia,* 461 U.S. 660, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983). The "very object" of the Commerce Clause is protection of interstate commerce from discriminatory local practices. *Welton v. Missouri,* 91 U.S. (1 Otto) 275, 280, 23 L.Ed. 347, 349 (1875); see also, L. Tribe, American Constitutional Law, *supra,* at § 6–17. However, rather than employing the Commerce Clause as a shield against unfair, discriminatory practices favoring local merchants, Quill now raises the Commerce Clause as a sword to carve out a tax-free mail order niche and gain an unfair competitive advantage over local retailers. It would be odd indeed if we were to hold that out-of-state sellers may invoke the Due Process Clause to promote a fundamentally unfair economic advantage over local sellers.

We conclude that Quill's asserted lack of physical presence is not fatal to the State's attempt to require Quill to collect and remit use tax on its sales into North Dakota. Applying *Bellas Hess* in light of subsequent case law, and within the context of contemporary society and commercial practice, we conclude that the concept of nexus encompasses more than mere physical presence within the state, and that the determination of nexus should take into consideration all connections between the out-of-state seller and the state, all benefits and opportunities provided by the state, and should stress economic realities rather than artificial benchmarks.

### F

The Court in *Bellas Hess* also focused upon the "virtual welter of complicated obligations" which would be imposed upon mail order sellers if they were required to collect and remit use taxes in every state. *Bellas Hess, supra,* 386 U.S. at 760, 87 S.Ct. at 1393, 18 L.Ed.2d at 510. This basis for the Court's holding has also been seri-

ously eroded by the technological advances of the past quarter-century. The almost universal usage of automated accounting systems, and corresponding advancements in computer technology, have greatly alleviated the administrative burdens created by such a collection duty. See, e.g., Hartman, Federal Limitations, *supra,* at § 10:8; Hartman, *Collection of the Use Tax, supra;* McCray, *Overturning Bellas Hess: Due Process Considerations,* 1985 B.Y.U. L.Rev. 265 (1985).

In addition, in subsequent use tax cases the Supreme Court has all but ignored the burdensome nature of imposition of the collection duty. Furthermore, the Supreme Court has never struck down a use tax solely because of the administrative burdens placed upon the out-of-state seller if sufficient nexus has first been found.

Finally, we note that the seller is allowed to retain a percentage of the use taxes collected as reimbursement for expenses incurred in collecting and remitting the tax. Section 57–40.2–07.1, N.D.C.C. This further alleviates any burdens created by requiring Quill to collect and remit the tax.

We conclude that the burdensome nature of the use tax collection duty does not prohibit imposition of this duty upon Quill in this case.[10]

### III

We now turn to the specifics of Quill's constitutional challenge in this case.

■■■■ All legislative enactments are imbued with a strong presumption of constitutionality, and this presumption is conclusive unless it is clearly shown that the statute contravenes the state or federal constitution. *North Dakota Council of School Administrators v. Sinner,* 458 N.W.2d 280 (N.D.1990). The party challenging the constitutionality of a statute has the burden of proving its constitutional infirmity. *Best Products Co., Inc. v.*

---

*Policy, and Theoretical Implications,* 66 Journal of Retailing 222 (1990).

**10.** This argument is also undermined in this case by Quill's extensive computer expertise. Quill sells computers and related hardware, and

has developed its own computer software to allow customers to contact Quill directly on their own computers to place orders, check price and availability, and communicate via an electronic bulletin board.

*Spaeth,* 461 N.W.2d 91 (N.D.1990); *Newman Signs, Inc. v. Hjelle,* 268 N.W.2d 741 (N.D.1978), *appeal dismissed,* 440 U.S. 901, 99 S.Ct. 1205, 59 L.Ed.2d 449 (1979). Any doubt must be resolved in favor of the constitutionality of the statute. *North Dakota Council of School Administrators, supra.*

■ Commerce Clause challenges to use taxes are reviewed under the *Complete Auto* test. See *Holmes, supra.* The only prong of the *Complete Auto* test raised by Quill is the nexus requirement.[11] This first prong is closely related to the fourth prong of *Complete Auto,* which requires that the tax be fairly related to the benefits, opportunities, or services provided by the taxing state. Nexus has historically been analyzed as whether the state has provided some protection, opportunity, or benefit for which it can expect a return. See, e.g., *Bellas Hess, supra; Wisconsin v. J.C. Penney Co.,* 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267 (1940). Thus, we necessarily consider these two related prongs in determining the constitutionality of the use tax as applied to Quill.[12]

■ The Supreme Court has clarified that the Due Process requirement of a "minimal connection" to establish nexus is encompassed within the *Complete Auto* test. *Trinova Corp. v. Michigan Department of Treasury, supra; Amerada Hess Corp. v. Director, Division of Taxation,* 490 U.S. 66, 109 S.Ct. 1617, 104 L.Ed.2d 58 (1989). Thus, if the tax satisfies the nexus requirement of the *Complete Auto* test, it a fortiori satisfies the Due Process nexus requirement. *Amerada Hess, supra.*

■ As discussed in previous sections of this opinion, current Due Process and Commerce Clause analyses indicate that lack of physical presence within the taxing state is not the sole determinative factor in analyzing nexus questions. Rather, we must review all of Quill's contacts with the State to determine whether Quill has a sufficient nexus to satisfy constitutional standards.

Quill's activities directed toward North Dakota consumers clearly establish a substantial "presence" within the State. To iterate Quill's activities, it has 3,500 active customers in North Dakota, and its annual sales of nearly $1,000,000 make it the sixth largest seller of office supplies in the State. It annually mails over 60 different catalogs and flyers to its North Dakota customers, accounting for 230,000 separate pieces of mail. Quill also has a "help line" for consumers to call if they have questions or problems with merchandise ordered from Quill, and specialized service representatives are available to assist with custom printing orders or to answer questions about computers available from Quill. Quill has availed itself of modern technology to engage in an extensive, continuous, and intentional solicitation and exploitation of the State's consumer market and has thereby established an ubiquitous presence in the State.

Quill has a further connection with North Dakota which supports a finding of nexus. Quill licenses to some of its North Dakota customers a computer software program, Quill Service Link ["QSL"], which permits customers direct computer access to Quill's computer. This allows customers to check Quill's available inventory, confirm current price, and order merchandise directly by computer. Customers with QSL can also communicate with Quill and other customers through an electronic "bulletin board."

Quill retains all rights in QSL through the license agreement. Quill also retains the right to terminate the license "forthwith without prior notice and without cause," and upon termination the customer must "immediately return Software, and copies thereof and the user documentation to Quill." The explicit terms of the licensing agreement belie Quill's assertion that it merely sells the software—lock, stock, and

---

**11.** Quill did not, in fact, place its arguments within the context of the *Complete Auto* test, which clearly governs review of a Commerce Clause challenge to a use tax. See *Holmes, supra.*

**12.** No assertion has been made that the use tax is not fairly apportioned or that it discriminates against interstate commerce. Thus, the second and third prongs of the *Complete Auto* test need not be addressed.

barrel—to the customer. Through its licensing agreement, Quill clearly retains rights to property situated in North Dakota,[13] providing further nexus with the State. See *Matter of Heftel Broadcasting Honolulu, Inc.*, 57 Hawaii 175, 554 P.2d 242 (1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977).

Quill asserts, however, that the State has provided no protections, benefits, or opportunities which justify imposition of the duty to collect and remit the use tax. Quill would have us limit our consideration to solely property-protection functions of the State, such as fire and police protection, in determining whether the State has given something for which it may ask a return. However, just as the Court's cases of the past 25 years have broadened the concept of nexus, so too have recent cases suggested an expanding view of the benefits which may support State taxation. See, e.g., *Goldberg, supra; Holmes, supra.* Such intangible factors as the benefit of a trained work force and the "other advantages" of a civilized society have been cited by the Court to support imposition of taxes. See, e.g., *Amerada Hess, supra; Goldberg, supra; Holmes, supra.* The

Court, in upholding a tax on an out-of-state seller, has also noted Justice Holmes' declaration that "government is the prerequisite for the fruits of civilization for which ... we pay taxes," and that, accordingly, it was the state that had made the seller's earnings possible. *Wisconsin v. J.C. Penney Co., supra,* 311 U.S. at 446, 61 S.Ct. at 250, 85 L.Ed. at 271.

Various commentators have noted that the benefits and opportunities considered in determining nexus should include economic benefits and opportunities conferred by the State. See, e.g., Hartman, Federal Limitations, *supra,* at §§ 2:7 and 10:8; Hartman, *Collection of the Use Tax, supra;* McCray, *Overturning Bellas Hess, supra;* Simet, *The Concept of "Nexus,", supra;* Note, *Imposition of the Duty to Collect State Use Taxes: Constitutional Prohibitions Are No Longer Valid in Mail Order Sales,* 32 S.D.L.Rev. 93 (1986). The underlying rationale is that these benefits and opportunities bear a more direct relationship to the generation of sales for the mail order seller than the comparatively inconsequential benefits and protections provided for a seller's property or personnel within

---

**13.** The State argues that Quill owns other property in North Dakota, providing a further showing of nexus and benefits. The State asserts that Quill makes sales on approval in North Dakota and retains title to the goods until the merchandise is accepted or rejected by the buyer. Thus, the State argues, Quill owns property within the State which receives fire and police protection, as well as other benefits.

Quill's catalog makes the following offer to customers:
"Use any product from Quill in your office FREE for 30 days. During that time, try it, inspect it, use it ... just to be sure you're satisfied with the product. You have no reason to pay us and can return it during that period for any reason ... no questions asked ... and we'll give you a full credit against your invoice."
In addition, customers may, at any time within 90 days of purchase, return any item for a full refund if not completely satisfied.

Section 41–02–43(1), N.D.C.C., [U.C.C. § 2–326] provides:
"*Sale on approval and sale or return—Consignment sales and rights of creditors.*
"1. Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is:

"a. A 'sale on approval' if the goods are delivered primarily for use.
"b. A 'sale or return' if the goods are delivered primarily for resale."
If a transaction constitutes a sale on approval under Section 41–02–43(1), title to the goods does not pass until the buyer accepts them. Section 41–02–44(1)(a), N.D.C.C.

Quill asserts, however, that its sales are not "sales on approval" because it does not offer an "unconditional guarantee of refund" and because in some cases the buyer must pay the return shipping costs.

The district court summarily rejected the State's argument and ruled that, as a matter of law, title to the merchandise passed to the purchaser immediately at the time of shipping. Although the court's ruling was wholly conclusory and failed to fully take into account the underlying factual issues necessary to a determination of the legal issues, we find it unnecessary to resolve this issue at this time. Because we have held that sufficient nexus exists to support imposition of the duty to collect and remit the use tax, we need not determine if Quill has additional nexus with the State through retention of title to goods sold on approval.

the State. Whether or not an out-of-state seller has a physical presence within the State, it is the in-state infrastructure which creates and maintains the consumer market and economic climate that fosters demand for the seller's goods and services.

The theory has been summarized by Professor Emeritus Hartman:

"An unrealistic facet of the *Bellas Hess* doctrine is that the Court presumably thought that a few 'warm bodies' in the taxing state—either operating from an office, or traipsing around hawking their wares without any in-state office—constitute a more satisfactory nexus with a state, for constitutional purposes, than other more substantial and meaningful connections. Benefits from the taxing state that are unrelated to physical contact with the state may be of vastly greater significance than those derived from the presence of a whole swarm of the out-of-state seller's agents soliciting business. Practically speaking, some form of physical presence within the state in furtherance of a business purpose is not essential to the existence of a meaningful nexus with the state. . . .

"For use tax collection purposes, the connection or nexus between the taxing state and out-of-state mail-order sellers should be an economic, rather than physical, relationship. When an out-of-state mail-order seller, for the purpose of realizing a profit, takes advantage of the taxing state's economic climate and milieu through systematic, continuous, and large-scale solicitation of that state's consumer market, that activity should constitute a connection or nexus sufficient to require the out-of-state seller to collect the use tax. When the state provides a substantial economic benefit to the production of income for the out-of-state seller, the taxing state should be able to demand a tithe from the seller." Hartman, *Collection of the Use Tax, supra,* 39 Vand.L.Rev. at 1013–1014.

Other benefits provided by the state to the mail order seller have also been noted:

"[I]f the buyer is a typical mail order consumer who remains passive in a transaction and does not enter the seller's state, actively initiate contact, negotiate substantial terms of a transaction, or undertake on-going business relationships with the seller, he is not deemed subject to the jurisdiction of the seller's state in a breach of contract action. Sellers are also prohibited from bringing suits in their own states against out-of-state buyers because of a Federal Trade Commission order enjoining such suits as unfair trade practices. A mail order seller may thus enforce his legal rights against a delinquent or fraudulent buyer *only* in the courts of the buyer's state. Thus it is the buyer's state that protects the revenues of the out-of-state seller.

"The buyer's state also benefits the seller by assuring him an orderly market through consumer protection and usury laws on mail order transactions. Such laws create consumer confidence and eliminate unscrupulous sellers from the market. Consumer confidence is critically important to sales which cross state lines. In mail order transactions, consumers must rely heavily on state enforcement mechanisms to rectify wrongs and enforce rights." McCray, *Overturning Bellas Hess, supra,* 1985 B.Y.U.L. Rev. at 285.

An additional indispensable service is provided by the State: it disposes of the 24 tons of solid waste contributed annually to North Dakota landfills by Quill's catalogs and flyers. Although a similar argument was recently rejected in *SFA Folio Collections, Inc. v. Bannon,* 217 Conn. 220, 585 A.2d 666 (1991), we do not find the reasoning of that case persuasive. The court's discussion of the issue, in total, states:

"The commissioner's argument that Folio derives benefit from Connecticut by virtue of the state disposing of the catalogs as paper trash is likewise without merit. Because the catalogs are the property of the Connecticut residents, it is axiomatic that it is the resident who is deriving the benefit from the state and who must contribute to the cost of the disposal." *SFA Folio Collections, Inc., supra,* 585 A.2d at 671 n. 6.

The court's rationale is far too simplistic. To suggest that the seller derives no benefit from the State's waste-collection efforts because theoretically the catalogs become the consumer's "property" when they reach the mailbox ignores the realities of the situation, and fails to take into account that most mail order solicitations have not been requested, and may in fact be unwanted, by the consumer.[14] It is the mail order seller who derives the most direct benefit from its own mailings, and it therefore is not unreasonable to assume that the seller derives some measure of benefit from the entity that is ultimately responsible for disposing of the veritable mountain of trash created thereby.[15] Certainly the benefit is as direct and consequential as the benefits provided by fire and police protection afforded to an independent contractor solicitor within the state, which have been found sufficient to uphold taxation. See *Tyler Pipe, supra.*

In response to the Connecticut court's rationale it might also be pointed out that, even if we accept the argument that catalogs and flyers become the consumer's property when they are received and that the consumer must therefore contribute to the cost of their disposal, it is the consumer, not the out-of-state seller, who bears the ultimate burden of the use tax. The benefit that the mail order seller receives through the waste collection and disposal services of the state are certainly direct enough to support imposition of the purely administrative burden of collecting and remitting the use tax. See *National Geographic, supra.*

Quill also derived other benefits from the State. Because Quill retained ownership rights in its QSL software and accompanying user documentation, Quill received fire and police protection for its property within the State. The record also demonstrates that Quill contacted North Dakota financial institutions to check credit information on customers, an activity furthered by State regulation of the banking industry.

We conclude that Quill's significant economic presence within the State and its retained ownership of property within the State generate a constitutionally sufficient nexus to justify imposition of the purely administrative duty of collecting and remitting the use tax. We also conclude that the State provides benefits, services, and opportunities which significantly aid Quill's business and which are related to the use tax. Accordingly, the use tax as applied to Quill satisfies the four-prong test of *Complete Auto* and does not violate the Due Process Clause or the Commerce Clause.

Because we hold that the State may constitutionally require Quill to collect and remit use tax on its North Dakota sales, the State's conduct provides no basis for relief under 42 U.S.C. §§ 1983 and 1988. It is therefore unnecessary to address Quill's cross-appeal.

The judgment of the district court is reversed and we remand for entry of a judgment declaring that Quill is a "retailer maintaining a place of business in this state" required to collect and remit use tax in accordance with Chapter 57–40.2, N.D. C.C.

ERIKSTAD, C.J., and LEVINE, MESCHKE and GIERKE, JJ., concur.

**14.** It is estimated that 44% of all such direct mail solicitations are disposed of unopened and unread. *Time,* November 26, 1990, at p. 64.

**15.** Recent estimates indicate that such "junk" mail "is now a nearly 4 million-ton colossus that accounts for 39% of all U.S. postal volume. This year about 41 lbs. of junk mail have been generated for each adult American." *Time,* November 26, 1990, at pp. 63–64.