# IN THE SUPREME COURT OF IOWA

No. 09–1032

Filed December 30, 2010

**KFC CORPORATION,**

    Appellant,

vs.

**IOWA DEPARTMENT OF REVENUE,**

    Appellee.

---

Appeal from the Iowa District Court for Polk County, Don C. Nickerson, Judge.

On review of agency action, the judgment of the district court is affirmed. **AFFIRMED**.

Paul H. Frankel, Craig B. Fields, and Mitchell A. Newmark of Morrison & Foerster LLP, New York, New York, and John V. Donnelly of Sullivan & Ward, P.C., West Des Moines, Iowa, for appellant.

Thomas J. Miller, Attorney General, Donald D. Stanley, Jr., Special Assistant Attorney General, and Marcia E. Mason, Assistant Attorney General, for appellee.

**APPEL, Justice.**

In this case, we must determine whether the State of Iowa may impose an income tax on revenue received by a foreign corporation that has no tangible physical presence within the state but receives revenues from the use of the corporation's intangible property within the state. After the Iowa Department of Revenue (IDOR) imposed an income tax assessment against the out-of-state corporation, the taxpayer filed a protest with the agency on constitutional and statutory grounds. IDOR rejected the protest. On review of the agency's action, the district court affirmed. KFC appealed. For the reasons expressed below, we affirm the judgment of the district court.

## I. Factual and Procedural Background.

KFC Corporation (KFC) is a Delaware corporation with its principal place of business in Louisville, Kentucky. Its primary business is the ownership and licensing of the KFC trademark and related system. KFC licenses its system to independent franchisees who own approximately 3400 restaurants throughout the United States. While KFC also licenses its system to related entities—including KFC National Management Company—all KFC restaurants in Iowa are owned by independent franchisees. KFC owns no restaurant properties in Iowa and has no employees in Iowa.

On October 19, 2001, IDOR issued to KFC an assessment in the amount of $284,658.08 for unpaid corporate income taxes, penalties, and interest for 1997, 1998, and 1999. KFC filed a timely protest of the assessment. IDOR answered the protest, and the matter was assigned by the Iowa Department of Inspections and Appeals to an administrative law judge (ALJ). Both sides filed motions for summary judgment.

In its motion for summary judgment, IDOR asserted that the requirements of the Commerce Clause were satisfied. IDOR argued that the "physical presence" requirement established in *National Bellas Hess, Inc. v. Department of Revenue of Illinois*, 386 U.S. 753, 87 S. Ct. 1389, 18 L. Ed. 2d 505 (1967), as reaffirmed in *Quill Corp. v. North Dakota*, 504 U.S. 298, 112 S. Ct. 1904, 119 L. Ed. 2d 91 (1992), was not necessary when a franchisor licensed intellectual property that generated income for the franchisor within the state from operations of independent franchisees. IDOR asserted that KFC's royalty income based on its franchisees' Iowa transactions was "taxable because it is derived from Iowa customers and is made possible by Iowa's infrastructure and legal protection of the Iowa marketplace." IDOR further argued that the imposition of the income tax was consistent with Iowa Code section 422.33(1) (1997) and its implementing administrative rules.

KFC resisted and filed a summary judgment motion of its own. KFC argued that its receipt of royalty income was not subject to tax by the State of Iowa. KFC observed that in *Quill*, the United States Supreme Court held that a use tax could not be imposed on a foreign corporation that had no physical contact with the taxing state. KFC noted that the *Quill* Court "did not state that its holding is limited to use tax collection obligations." KFC argued that, because it had no physical presence in Iowa, the state could not constitutionally impose the income tax. In the alternative, KFC pressed a statutory claim. KFC asserted that under Iowa Code section 422.33(1), KFC was not subject to tax because it lacked property "located or having a situs in this state."

KFC did not raise any issue related to penalties in its motion for summary judgment. In its memorandum of points and authorities, however, KFC asserted that the penalty assessed by IDOR should be

waived under applicable statutes because it had substantial authority to rely upon its position. *See* Iowa Code § 421.27(1)(*h*), (2)(*f*), (3)(*d*).

The ALJ issued a detailed ruling in IDOR's favor. The ALJ found that KFC owned, managed, protected, and licensed KFC marks and system during the years in question. As part of its business, KFC entered into franchise agreements with franchisees in Iowa who remitted royalty and/or license income to KFC for the use of KFC marks and system at a rate of four percent of gross revenues for each month, with a minimum royalty amount adjusted for increases in the Consumer Price Index. Throughout the period, KFC had the right to control the use of its marks by Iowa franchises and the right to control the nature and quality of goods sold under the marks by them.

Further, the ALJ found that Iowa franchisees were required by their franchise agreements to adhere to KFC's requirements regarding menu items, advertising, marketing, and physical facilities. In order to comply with applicable standards, Iowa franchisees were required to purchase equipment, supplies, paper goods, and other products from only KFC-approved manufacturers and distributors. Quality assurance activities were performed in Iowa on behalf of KFC by employees of KFC's affiliates. The ALJ also found that KFC franchisees in Iowa could deduct from their taxable income the royalty payments made to KFC.

Applying law to these facts, the ALJ held that the IDOR assessment did not violate the Commerce Clause or Iowa law. With respect to the Commerce Clause question, the ALJ concluded that "physical presence" is not required when a state imposes taxation on income. Further, the ALJ concluded IDOR demonstrated that KFC had a sufficient nexus to Iowa to support IDOR's assessment. According to the ALJ, the franchise right was an intangible with a direct connection to

Iowa. The imposition of tax on income generated by a franchisor within a state was not an undue burden on commerce, but rather a payment to government that provided the economic climate for the business to prosper.

On the state law question, the ALJ found that KFC was "deriving income from sources within this state" as required by Iowa Code section 422.33(1). According to the ALJ, KFC received such income when it received royalty and/or license income from franchisees located within the state. The ALJ determined that the provision of Iowa Code section 422.33(1) requiring a "situs in this state" did not require a physical situs, but, citing Webster's dictionary, included "the place where some thing exists or originates; the place where something (as a right) is held to be located in law." The ALJ did not make a ruling of any kind or refer in any way to the issue of penalties in the decision.

On appeal, the director of IDOR affirmed the ALJ. The director characterized the issue on appeal as whether "KFC ha[d] sufficient nexus with Iowa to be subject to Iowa corporation income tax?" The director adopted and incorporated the findings of fact of the ALJ without revisions. The director also adopted the conclusions of law made by the ALJ with additions and modifications. With respect to the Commerce Clause issue, the director noted that several states have held that an economic presence satisfies the "substantial nexus" requirement for corporate income tax purposes. The director also found that, under Iowa law, KFC owed corporate income tax under Iowa Code section 422.33(1). Like the ALJ, the director made no findings on the penalty issue.

KFC sought judicial review of the agency's decision in district court. The district court affirmed the director on the Commerce Clause issue, finding that "physical presence" was not required under the

Commerce Clause for the imposition of state income tax. The district court further found that, because KFC's marks and trademarks were "an integral part of business activity occurring regularly in Iowa," the income derived from the use of that property was taxable under Iowa law. On the issue of penalties, the district court found the issue was not preserved because KFC did not obtain a ruling on the issue from the agency and also because KFC did not seek a ruling on the issue in its motion for summary judgment.

## II. Standard of Review.

The Iowa Administrative Procedure Act governs judicial review of decisions of the Iowa Department of Revenue. *See* Iowa Code ch. 17A; *AOL LLC v. Iowa Dep't of Revenue,* 771 N.W.2d 404, 407 (Iowa 2009). With respect to the constitutional questions in this case, the parties agree that our review is de novo. *See State v. Taeger,* 781 N.W.2d 560, 564 (Iowa 2010).

The parties contest the standard of review on the statutory issue presented in this case. KFC contends that the district court erred in granting deference to IDOR's legal conclusion on state law issues under Iowa Code section 422.33(1) and that our review of IDOR's legal determinations is for errors at law. IDOR contends that it has been clearly vested with discretion to interpret the applicable provisions of law and that, as a result, its determinations may be reversed only if "irrational, illogical, or wholly unjustifiable." *See Renda v. Iowa Civil Rights Comm'n,* 784 N.W.2d 8, 12–14 (Iowa 2010) (noting that the question of whether the legislature has clearly vested an agency with discretion to determine applicable provisions of law is generally to be based upon an analysis of individual provisions of law, not upon a wholesale conclusion regarding chapters of the Code); *Iowa Ag Constr.*

*Co. v. Iowa State Bd. of Tax Review*, 723 N.W.2d 167, 173 (Iowa 2006) (holding broad rule-making authority may give rise to deference to administrative interpretations).

In this case, however, we need not reach the issue of whether IDOR is entitled to deference in its interpretation of Iowa Code section 422.33(1) because, even if deference were not afforded, we conclude, for the reasons expressed in this opinion, that IDOR correctly interpreted the applicable statutes.

**III.  The Dormant Commerce Clause Claim.**

**A. Introduction to Dormant Commerce Clause Issues Presented in This Case.**  In *Bellas Hess* and later in *Quill*, the United States Supreme Court held under the dormant Commerce Clause that, in order for a state to require an out-of-state entity to collect sales and use taxes on transactions with in-state residents, the entity must have some "physical presence" within the taxing jurisdiction.  *Bellas Hess*, 386 U.S. at 756–59, 87 S. Ct. at 1391–93, 18 L. Ed. 2d at 508–10; *Quill*, 504 U.S. at 317–18, 112 S. Ct. at 1916, 119 L. Ed. 2d at 110.  In this case, two questions arise in light of *Bellas Hess* and *Quill*.  The first question is whether the State of Iowa satisfied the "physical presence" test of *Bellas Hess* and *Quill* in this case.  The second question is whether the "physical presence" test in *Bellas Hess* and *Quill* applies at all to cases involving state income taxation.

We begin our discussion with a survey of the dormant Commerce Clause cases of the United States Supreme Court.  In our survey, we focus on the nature of dormant Commerce Clause analysis and the struggle between formalistic approaches and approaches that emphasize economic substance in the context of both sales and use taxes and state income taxes.  We then examine state court cases after *Quill* grappling

with the issues presented in this case. Using these authorities to illuminate our discussion, we analyze the dormant Commerce Clause issues presented in this case.

**B. Approach of the United States Supreme Court to the Dormant Commerce Clause.**

1. *Evolution of Supreme Court "dormant" Commerce Clause doctrine prior to* Bellas Hess *and* Quill*.* The United States Constitution expressly authorizes Congress to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. Since the nineteenth century, the United States Supreme Court has interpreted the Commerce Clause as more than merely an affirmative grant of power, finding a negative sweep to the Clause as well. *See Brown v. Maryland*, 25 U.S. (12 Wheat.) 419, 448–49, 6 L. Ed. 678, 688–89 (1827); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 72–78, 6 L. Ed. 23, 70–78 (1824). As a result, the Supreme Court has applied the "negative" or "dormant" Commerce Clause to limit state taxation powers notwithstanding the absence of congressional legislation.

Over time, the Supreme Court's approach to state taxation under the dormant Commerce Clause has evolved from a relatively strong prohibition toward a more practical assessment that recognizes the needs of the states to raise revenue. The early view of the Supreme Court was that "no state ha[d] the right to lay a tax on interstate commerce in any form." *Leloup v. Port of Mobile*, 127 U.S. 640, 648, 8 S. Ct. 1380, 1384, 32 L. Ed. 311, 314 (1888). The Supreme Court later chiseled this broad prohibition into one that only precluded the states from levying taxes that imposed "direct" burdens on interstate commerce. *See, e.g., Adams Express Co. v. Ohio State Auditor*, 165 U.S. 194, 220, 17 S. Ct. 305, 309, 41 L. Ed. 683, 695 (1897); *see also Freeman v. Hewit,*

329 U.S. 249, 257–58, 67 S. Ct. 274, 279, 91 L. Ed. 265, 274–75 (1946); *Felt & Tarrant Mfg. Co. v. Gallagher*, 306 U.S. 62, 66–68, 59 S. Ct. 376, 378, 83 L. Ed. 488, 491–92 (1939).

The "direct" vs. "indirect" distinction, however, was subject to strong attack by Justice Stone. In a classic dissent, Justice Stone attacked the distinction as unrealistic and opined that, "[i]n . . . making use of the expressions, 'direct' and 'indirect interference' with commerce, we are doing little more than using labels to describe a result rather than any trustworthy formula by which it is reached." *Di Santo v. Pennsylvania*, 273 U.S. 34, 44, 47 S. Ct. 267, 271, 71 L. Ed. 524, 530 (1927) (Stone, J., dissenting), *overruled by California v. Thompson*, 313 U.S. 109, 116, 61 S. Ct. 930, 934, 85 L. Ed. 1219, 1223 (1941). Eventually, the Supreme Court, apparently heeding Justice Stone's call for a more realistic and less formalistic approach, began to analyze the validity of state taxes by applying a "nexus" doctrine under the Due Process and dormant Commerce Clauses.

Applying the "nexus" doctrine, the Supreme Court upheld sales and use taxes when the taxpayer had some minimal physical presence within the jurisdiction, even though the transactions leading up to the imposition of the tax were not linked to the physical presence. *See Scripto, Inc. v. Carson*, 362 U.S. 207, 209–11, 80 S. Ct. 619, 620–22, 4 L. Ed. 2d 660, 663–64 (1960) (upholding use tax based on the physical presence of ten advertising brokers conducting continuous solicitation in the taxing state); *Nelson v. Sears, Roebuck & Co.*, 312 U.S. 359, 364, 61 S. Ct. 586, 588–89, 85 L. Ed. 888, 892 (1941) (upholding use tax on mail-order sales when the taxpayer had retail outlets in the state, even though the retail outlets were not connected with mail-order sales).

While none of these cases held that physical presence was required in order for a state to require an out-of-state entity to collect sales and use taxes from customers, the fact of physical presence in these sales and use tax cases played a significant role in the analysis.

While "physical presence" may have been a significant feature, if not a requirement, in the Supreme Court's dormant Commerce Clause analysis in early sales and use tax cases, "physical presence" in the narrow sense does not appear as an important factor in cases involving state income taxation. *See Nw. States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 464, 79 S. Ct. 357, 365–66, 3 L. Ed. 2d 421, 431 (1959) (observing that income tax could be supported if the "activities form a sufficient 'nexus between such a tax and transactions within a state for which the tax is an exaction'" (quoting *Wisconsin v. J.C. Penney Co.,* 311 U.S. 435, 445, 61 S. Ct. 246, 250, 85 L. Ed. 267, 271 (1940)); *Int'l Harvester Co. v. Wis. Dep't of Taxation,* 322 U.S. 435, 441, 64 S. Ct. 1060, 1064, 88 L. Ed. 1373, 1379 (1944) (stating that "[p]ersonal presence within the state of the stockholder-taxpayers is not essential to the constitutional levy of a tax taken out of so much of the corporation's Wisconsin earnings as is distributed to them"); *J.C. Penney Co.,* 311 U.S. at 444, 61 S. Ct. at 250, 85 L. Ed. at 270 (holding that the income-tax test under the dormant Commerce Clause is whether the state has "exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society"); *New York ex rel. Whitney v. Graves,* 299 U.S. 366, 372, 57 S. Ct. 237, 238, 81 L. Ed. 285, 288 (1937) (holding that, with respect to intangible property such as a seat on the New York Stock Exchange, the business situs of the intangible property

may "grow out of the actual transactions of a localized business"). In these cases involving challenges to state income taxes, the Supreme Court has not adopted a mechanical or formalistic approach to the dormant Commerce Clause nexus requirement but, instead, has emphasized a flexible approach based on economic reality and the nature of the activity giving rise to the income that the state seeks to tax.

2. *Emergence of the* Bellas Hess *physical presence test for sales and use taxes arising from mail-order sales.* In *Bellas Hess,* the Supreme Court considered a challenge to an Illinois statutory requirement that an out-of-state entity collect and remit the use tax owed by consumers who purchased goods for use within Illinois. *Bellas Hess,* 386 U.S. at 755, 87 S. Ct. at 1390, 18 L. Ed. 2d at 507–08. The out-of-state entity was a mail-order merchant that had no in-state retail outlets, sales representatives, or property. *Id.* at 753–54, 87 S. Ct. at 1389–90, 18 L. Ed. 2d at 507. In *Bellas Hess,* the Supreme Court by a six-to-three vote concluded that the use tax could not be constitutionally applied under the dormant Commerce Clause if the taxpayer did not have physical presence in the taxing jurisdiction. *Id.* at 759–60, 87 S. Ct. at 1392–93, 18 L. Ed. 2d at 510–11.

The *Bellas Hess* majority first noted that the nexus requirements under the Due Process and dormant Commerce Clauses were "closely related" and "similar." *Id.* at 756, 87 S. Ct. at 1391, 18 L. Ed. 2d at 508. The *Bellas Hess* Court observed that the "same principles have been held applicable in determining the power of a State to impose the burdens of collecting use taxes upon interstate sales." *Id.* Thus, at the time of *Bellas Hess,* there was no material distinction between the nexus required by due process and the nexus required by the dormant Commerce Clause. *See id.*

Turning to whether Illinois met its burden of showing an adequate nexus, the *Bellas Hess* majority noted that the Court had "never held that a State may impose the duty of use tax collection and payment upon a seller whose only connection with customers in the State is by common carrier or the United States mail." *Id.* at 758, 87 S. Ct. at 1392, 18 L. Ed. 2d at 509. The *Bellas Hess* majority emphasized that over 2300 jurisdictions could impose sales and use taxes and that, with many local variations in rates of use tax and allowable exemptions, the administrative burdens could impede interstate business. *Id.* at 759–760 & n.12, 87 S. Ct. at 1392–93 & n.12, 18 L. Ed. 2d at 510 & n.12. In addition, the Illinois statute imposed the burden of requiring the vendor to provide each purchaser with a receipt showing payment of the tax, as well as keep "such records, receipts, invoices and other pertinent books, documents, memoranda and papers as the [State] shall require in such form as the [State] shall require." *Id.* at 755, 87 S. Ct. at 1390, 18 L. Ed. 2d at 508. Before the state could impose the administrative burdens of determining, collecting, and documenting the myriad different taxes from the thousands of jurisdictions that could be imposed, the *Bellas Hess* majority held that some sort of physical nexus with the taxing state was required. *Id.* at 758, 87 S. Ct. at 1392, 18 L. Ed. 2d at 509–10.

Justice Fortas, joined by Justices Black and Douglas, dissented. *Id.* at 760, 87 S. Ct. at 1393, 18 L. Ed. 2d at 511 (Fortas, J., dissenting). Justice Fortas stated that "large-scale, systematic, continuous solicitation and exploitation of the Illinois consumer market" was a sufficient basis for supporting the tax. *Id.* at 761–62, 87 S. Ct. at 1394, 18 L. Ed. 2d at 511. On the question of benefits from the state, Justice Fortas asserted that, if Bellas Hess had a retail store in Illinois, or maintained resident sales personnel in the state, the benefit it received

from the State of Illinois would not be affected. *Id.* at 762–64, 87 S. Ct. at 1394–95, 18 L. Ed. 2d at 512–13. Conversely, the burden on Bellas Hess is no different than on a local retailer with comparable sales. *Id.* at 766, 87 S. Ct. at 1396, 18 L. Ed. 2d at 514. Justice Fortas presciently warned that the approach of the majority would open a sizable "haven of immunity" that would increase dramatically in the future. *Id.* at 764, 87 S. Ct. at 1395, 18 L. Ed. 2d at 513.

Nothing in *Bellas Hess*, however, altered the relationship between the Due Process and dormant Commerce Clause nexus requirements or explicitly overruled the principles expressed in the state income tax nexus cases. Instead, *Bellas Hess* seems to represent the development of a strand of authority under the dormant Commerce Clause with at least some formalism in its categorical approach to the dormant Commerce Clause nexus requirement in the field of sales and use taxes.

After *Bellas Hess*, the Supreme Court considered the nexus issue in a number of cases. In general, the cases stand for the proposition that constitutionally required "physical presence" (1) is not "the slightest physical presence," but nonetheless need not be very substantial to satisfy the requirements of both due process and the dormant Commerce Clause, and (2) need not be related to the transaction giving rise to tax liability. *See, e.g.*, *Trinova Corp. v. Mich. Dep't of Treasury*, 498 U.S. 358, 373–74, 384–87, 111 S. Ct. 818, 829, 835–37, 112 L. Ed. 2d 884, 904–05, 911–13 (1991) (upholding a value added tax imposed on entities having "business activity" within the state and noting that the nexus requirement under the dormant Commerce Clause "encompasses" the due process requirement); *Nat'l Geographic Soc'y v. Cal. Bd. of Equalization*, 430 U.S. 551, 556, 97 S. Ct. 1386, 1390, 51 L. Ed. 2d 631, 637 (1977) (rejecting "slightest presence test," but holding California

could impose use tax on mail-order sales of an out-of-state vendor who maintained two offices within the state, even though the offices had nothing to do with mail-order operations); *Standard Pressed Steel Co. v. Wash. Dep't of Revenue*, 419 U.S. 560, 563–64, 95 S. Ct. 706, 709, 42 L. Ed. 2d 719, 723–24 (1975) (holding in-state presence of one full-time employee sufficient to support imposition of gross receipts tax on sales to out-of-state entity).

3. Complete Auto*: The demise of formalism in favor of a multifactor test.* After *Bellas Hess*, the United States Supreme Court revisited the requirements of the dormant Commerce Clause in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S. Ct. 1076, 51 L. Ed. 2d 326 (1977). In *Complete Auto*, the Supreme Court, in an opinion by Justice Blackmun, repeated the observation by Justice Holmes that "interstate commerce may be made to pay its way" through the imposition of state taxes. *Complete Auto*, 430 U.S. at 281, 284, 97 S. Ct. at 1080, 1082, 51 L. Ed. 2d at 332, 334. In order for such taxes to pass Commerce Clause muster, however, Justice Blackmun concluded that the tax must be (1) applied to an activity having a "substantial nexus" with the taxing state, (2) be "fairly apportioned," (3) not "discriminate against interstate commerce," and (4) be "fairly related to the services provided by the State." *Id.* at 279, 97 S. Ct. at 1079, 51 L. Ed. 2d at 331.

Justice Blackmun's opinion in C*omplete Auto* has emerged as a landmark in dormant Commerce Clause jurisprudence. What precisely was meant by the term "substantial nexus" was unclear and left for further case law development. The *Complete Auto* opinion, however, emphasizes the practical effects of state taxing statutes on interstate commerce and avoids formal distinctions and abstractions. *Id.* The dormant Commerce Clause worm seemed to have turned once again in

*Complete Auto* in favor of utilization of a realistic assessment of economic impacts rather than formal doctrinal categories.

Additional dormant Commerce Clause cases after *Complete Auto* confronted the nexus issue. For instance, in *Tyler Pipe Industries, Inc. v. Washington State Department of Revenue*, 483 U.S. 232, 107 S. Ct. 2810, 97 L. Ed. 2d 199 (1987), the Supreme Court, in a challenge to a state's business and occupation tax, rejected the notion that the actions of sales representatives within a state could not be attributed to the out-of-state taxpayer for purposes of determining substantial nexus because they were independent contractors. *Tyler Pipe Indus., Inc.*, 483 U.S. at 250, 107 S. Ct. at 2821, 97 L. Ed. 2d at 215. The Supreme Court further cited with approval the observation made by the Washington Supreme Court that "the crucial factor governing nexus is whether the activities performed in this state on behalf of the taxpayer are significantly associated with the taxpayer's ability to establish and maintain a market in this state for the sales." *Id.*

4. *Post-*Bellas Hess *developments in due process.* In *Complete Auto,* the Court imported into the Commerce Clause analysis the same kind of thinking reflected in the evolving due process cases. Originally, under *Pennoyer v. Neff*, 95 U.S. (5 Otto) 714, 723–24, 24 L. Ed. 565, 569 (1877), physical presence was central in determining whether a party had sufficient minimum contacts with a forum to submit to its jurisdiction. The physical presence test was famously abandoned by Justice Stone in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945). In *International Shoe,* the Supreme Court rejected any requirement of physical presence in favor of minimum contacts that allowed the assertion of state judicial power consistent with " 'traditional notions of fair play and substantial justice.' " *Int'l Shoe*, 326

U.S. at 316, 66 S. Ct. at 158, 90 L. Ed. at 102 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S. Ct. 339, 343, 85 L. Ed. 278, 283 (1940)).

In rejecting the physical presence test, Justice Stone noted in *International Shoe* that the "corporate personality" was a fiction of the law because a corporation is not physically present anywhere. *Id.* Yet, citing Learned Hand, Justice Stone observed that "the terms 'present' or 'presence' are used merely to symbolize those activities of the corporation's agent within the state which courts will deem to be sufficient to satisfy the demands of due process." *Id.* at 316–17, 66 S. Ct. at 158, 90 L. Ed. at 102 (citing *Hutchinson v. Chase & Gilbert*, 45 F.2d 139, 141 (2d Cir. 1930)). In *International Shoe*, the activities carried on within Washington "in behalf" of the corporate respondent were "systematic and continuous" and therefore sufficient to satisfy due process. *Id.* at 320, 66 S. Ct. at 160, 90 L. Ed. at 104.

Cases decided after *International Shoe* further reinforced the pragmatic nature of the due process question and lessened the role of "physical presence." *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S. Ct. 2174, 2184, 85 L. Ed. 2d 528, 543 (1985) (holding that jurisdiction under due process may not be avoided merely because the defendant "did not *physically* enter the forum State"); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98, 100 S. Ct. 559, 567, 62 L. Ed. 2d 490, 502 (1980) (finding that due process was satisfied when an out-of-state corporation "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State"); *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223, 78 S. Ct. 199, 201, 2 L. Ed. 2d 223, 226 (1957) (finding sufficient minimum contacts for purposes of due process when the suit was based on a contract that had substantial connection with the forum state even

though there was no evidence of physical presence in the forum state). Citing prior case law, the *Burger King* Court declared that the Court had long ago abandoned "mechanical tests" based on " 'conceptualistic . . . theories of the place of contracting or of performance.' " *Burger King*, 471 U.S. at 478–79, 105 S. Ct. at 2185, 85 L. Ed. 2d at 544–45 (quoting *Hoopeston Canning Co. v. Cullen*, 318 U.S. 313, 316, 63 S. Ct. 602, 605, 87 L. Ed. 777, 782 (1943)).

5. *Squaring* Bellas Hess *with* Complete Auto *and evolving due process precedent:* Quill. After *Complete Auto* and *Burger King*, a substantial question that emerged was whether the life blood had been drained from *Bellas Hess* by subsequent developments. The mail-order industry had grown rapidly and, much as Justice Fortas had feared in his *Bellas Hess* dissent, a large tax haven had been created. *See Bellas Hess*, 386 U.S. at 762–64, 87 S. Ct. at 1394–95, 18 L. Ed. 2d at 512–13 (Fortas, J., dissenting). Indeed, mail-order sales amounted to only $2.4 billion four years prior to *Bellas Hess*, but had grown to $150 billion by 1983. *See* Martin L. McCann, Note, *Use Tax, Mail Order Sales, and the Constitution: Recent Developments in Connecticut*, 12 U. Bridgeport L. Rev. 137, 149 (1991). The question arose whether the Court in *Bellas Hess* had inadvertently opened a tax avoidance scheme that needed to be closed. Further, technological developments made the physical presence requirement look rather quaint. Out-of-state mail order marketers now availed themselves of sophisticated technology to sell their products. *Id.* at 151–52. In addition, the Supreme Court in its personal jurisdiction cases, such as *International Shoe, McGee, World-Wide Volkswagen*, and *Burger King*, had eviscerated the physical presence requirement for due process, which for all practical purposes was thought to be coextensive with any restraints under the dormant Commerce Clause. *Id.* at 153.

Finally, although there had been a number of twists and turns, it seemed that the era of formalism or mechanical tests under the dormant Commerce Clause was over after *Complete Auto*. In light of these factors, many observers thus heard, or at least hoped they heard, a death rattle for the "physical presence" holding of *Bellas Hess*. *See* Paul J. Hartman, *Collection of the Use Tax on Out-of-State Mail-Order Sales*, 39 Vand. L. Rev. 993, 1006–14 (1986); Sandra B. McCray, *Overturning* Bellas Hess*: Due Process Considerations*, 1985 BYU L. Rev. 265, 295–96 (1985); Donald P. Simet, *The Concept of "Nexus" and State Use and Unapportioned Gross Receipts Taxes*, 73 Nw. U. L. Rev. 112, 112–14 (1978).

Certainly the North Dakota Supreme Court was prepared to give *Bellas Hess* a decent burial. In *State ex rel. Heitkamp v. Quill Corp.*, 470 N.W.2d 203 (N.D. 1991), the North Dakota Supreme Court considered the validity of the imposition of a use tax on an out-of-state seller who lacked physical presence in the state. *Heitkamp*, 470 N.W.2d at 204–05, *overruled by Quill*, 504 U.S. at 301–02, 112 S. Ct. at 1907, 119 L. Ed. 2d at 99–100. The North Dakota Supreme Court declared that the "economic, social, and commercial landscape upon which *Bellas Hess* was premised no longer exist[ed]," which made it inappropriate to follow *Bellas Hess*. *Id.* at 208–09. The North Dakota Supreme Court cited the staggering growth in the mail-order business and the advance in computer technology, which made compliance more practical. *Id.* Further, the North Dakota Supreme Court noted that the legal environment had changed in light of *Complete Auto* and its progeny, which indicated that the United States Supreme Court was moving in a direction away from the "physical presence" test in favor of a more flexible approach. *Id.* at 209–13. Applying the test of *Complete Auto*, the

North Dakota Supreme Court found the test was satisfied in light of the fact that North Dakota provided an "economic climate that fostere[d] demand" for Quill products and maintained a legal system that supported business within the state. *Id.* at 218.

The United States Supreme Court granted certiorari and reversed the North Dakota Supreme Court. Justice Stevens wrote for the majority that "[w]hile we agree with much of the state court's reasoning," the Supreme Court nonetheless was required to reverse. *Quill*, 504 U.S. at 302, 112 S. Ct. at 1907, 119 L. Ed. 2d at 99.

Justice Stevens began the substantive discussion by canvassing the existing case law regarding due process and concluding that "physical presence" was not required to support taxation if a corporation "purposefully avails itself of the benefits of an economic market in the forum State." *Id.* at 307, 112 S. Ct. at 1910, 119 L. Ed. 2d at 103. Thus, to the extent *Bellas Hess* required "physical presence" to satisfy due process, it was overruled. *See id.*

Justice Stevens then turned to the dormant Commerce Clause issue. After reviewing the evolution of the dormant Commerce Clause doctrine, Justice Stevens observed that, "[w]hile contemporary Commerce Clause jurisprudence might not dictate the same result were the issue to arise for the first time today," the *Bellas Hess* approach to Commerce Clause nexus was not inconsistent with *Complete Auto*. *Id.* at 311, 112 S. Ct. at 1912, 119 L. Ed. 2d at 105. In order to reach that result, Justice Stevens concluded the "minimum contacts" test under due process and the "substantial nexus" test under the Commerce Clause, "[d]espite the similarity in phrasing," were "not identical." *Id.* at 312, 112 S. Ct. at 1913, 119 L. Ed. 2d at 106. Unlike the Due Process Clause, the nexus requirement under the Commerce Clause does not serve as "a

proxy for notice, but rather a means for limiting state burdens on interstate commerce." *Id.* at 313, 112 S. Ct. at 1913, 119 L. Ed. 2d at 107. In a footnote, Justice Stevens noted, absent the physical presence rule of *Bellas Hess*, a vendor might be required to comply with tax obligations in 6000-plus taxing jurisdictions with many variations in rate of tax, allowable exemptions, and in administrative duties. *See id.* at 313 n.6, 112 S. Ct. at 1914 n.6, 119 L. Ed. 2d at 107 n.6.

Turning to the decision of the North Dakota Supreme Court on the Commerce Clause issue, Justice Stevens recognized the state supreme court's emphasis on the Supreme Court's " 'retreat from the formalistic constrictions of a stringent physical presence test in favor of a more flexible substantive approach.' " *Id.* at 314, 112 S. Ct. at 1914, 119 L. Ed. 2d at 107 (quoting *Heitkamp*, 470 N.W.2d at 214). Yet, Justice Stevens concluded that, "[a]lthough we agree with the state court's assessment of the evolution of our cases, we do not share its conclusion that this evolution indicates that the Commerce Clause ruling of *Bellas Hess* is no longer good law." *Id.* at 314, 112 S. Ct. at 1914, 119 L. Ed. 2d at 107–08.

Justice Stevens recognized that "we have not, in our review of other types of taxes, articulated the same physical-presence requirement." *Id.* But, Justice Stevens reasoned that the "silence does not imply repudiation of the *Bellas Hess* rule." *Id.* at 314, 112 S. Ct. at 1914, 119 L. Ed. 2d at 108.

Justice Stevens then considered justifications for the continued application of the *Bellas Hess* approach. He noted that *Bellas Hess* created a "discrete realm of commercial activity that is free from interstate taxation" and a "safe harbor" for vendors from state-imposed duties to collect sales and use taxes. *Id.* at 315, 112 S. Ct. at 1914, 119

L. Ed. 2d at 108. While he recognized that the physical-presence rule, like all bright-line rules, "appears artificial at its edges," the artificiality was offset by the benefits of a "clear rule." *Id.* at 315, 112 S. Ct. at 1914–15, 119 L. Ed. 2d at 108.

Justice Stevens further emphasized that one of the benefits in affirming *Bellas Hess* was that reaffirmance of the established rule "encourages settled expectations." *Id.* at 316, 112 S. Ct. at 1915, 119 L. Ed. 2d at 109. According to Justice Stevens, it is not unlikely that the dramatic growth of the mail-order industry "is due in part to the bright-line exemption from state taxation created from *Bellas Hess.*" *Id.* As a result, Justice Stevens concluded that the *Bellas Hess* rule "has engendered substantial reliance and has become part of the basic framework of a sizeable industry." *Id.* at 317, 112 S. Ct. at 1916, 119 L. Ed. 2d at 110. According to Justice Stevens, the value of a bright-line test and the doctrine and principles of stare decisis indicate that *Bellas Hess* remains good law. *See id.*

Justice Stevens closed his opinion by noting that the decision, apparently a difficult one, was "made easier" by the fact Congress, which "may be better qualified to resolve" the issue, could have the last word. *Id.* at 318, 112 S. Ct. at 1916, 119 L. Ed. 2d at 110. In light of the reversal of the due process holding of *Bellas Hess*, Congress is "now free to decide whether, when, and to what extent the States may burden interstate mail-order concerns with a duty to collect use taxes." *Id.*

Justice Scalia, joined by Justices Kennedy and Thomas, concurred in part and concurred in the judgment. *Id.* at 319, 112 S. Ct. at 1923, 119 L. Ed. 2d at 111 (Scalia, J., concurring). Justice Scalia concurred in the majority opinion regarding due process. *Id.* On the Commerce Clause question, Justice Scalia noted that Congress had the power to

change the result of *Bellas Hess* through legislation. *Id.* at 320, 112 S. Ct. at 1923, 119 L. Ed. 2d at 111–12. As a result, Justice Scalia further noted that stare decisis applies with special force where Congress retains the power to override a court decision. *Id.* Justice Scalia would not have engaged in any revisiting of the merits of the holding. *Id.*

Justice White concurred in part and dissented in part. *Id.* at 321, 112 S. Ct. at 1916, 119 L. Ed. 2d at 112 (White, J., concurring in part and dissenting in part). He agreed that physical presence was not required for due process, but also asserted that it was not required under the Commerce Clause. *Id.* at 321–22, 112 S. Ct. at 1916–17, 119 L. Ed. 2d at 113. In particular, Justice White noted that, in *National Geographic Society,* the Court decoupled any notion of transactional nexus from the inquiry and focused solely on whether there were sufficient contacts with the jurisdiction imposing the tax. *Id.* at 323–24, 112 S. Ct. at 1918, 119 L. Ed. 2d at 114. Further, Justice White concluded that cases subsequent to *Bellas Hess* undermine its continued vitality and that the rule should be abandoned in its entirety. *Id.* at 326–27, 112 S. Ct. at 1919–20, 119 L. Ed. 2d at 115–16. Justice White would jettison the formalism in the physical presence test for the functionality of Justice Rutledge's concurring opinion in *Freeman.* *Id.* at 325–27, 112 S. Ct. at 1918–20, 119 L. Ed. 2d at 115–16 (citing *Freeman,* 329 U.S. at 259, 67 S. Ct. at 280, 91 L. Ed. at 275 (Rutledge, J., concurring)). He noted the illogic of imposing a tax on a small, out-of-state vendor with one employee residing in the taxing state, while allowing a large vendor with no employees to escape the tax. *Id.* at 328–29, 112 S. Ct. at 1920, 119 L. Ed. 2d at 117.

6. *Post-*Quill *developments.* After *Quill,* the Supreme Court has generally avoided Commerce Clause cases involving the authority of

states to impose taxes other than sales and use taxes on out-of-state entities with or without "physical presence." While there have been a number of cases in which the question has been squarely posed, the Supreme Court has repeatedly denied certiorari on them. *See, e.g., A & F Trademark, Inc. v. Tolson,* 605 S.E.2d 187, 194–95 (N.C. Ct. App. 2004), *cert. denied,* 546 U.S. 821 (2005); *Geoffrey, Inc. v. S.C. Tax Comm'n,* 437 S.E.2d 13, 18–19 (S.C.), *cert. denied,* 510 U.S. 992 (1993); *J.C. Penney Nat'l Bank v. Johnson,* 19 S.W.3d 831, 836–42 (Tenn. Ct. App. 1999), *cert. denied,* 531 U.S. 927 (2000).

**C. Approach of State Appellate Courts to Nexus Requirement Under Dormant Commerce Clause for State Taxation of Income.** *Geoffrey* is the first state case considering the question of whether "physical presence" was required for the imposition of state taxes other than sales or use taxes. *Geoffrey,* 437 S.E.2d at 18 & n.4. In *Geoffrey,* the South Carolina Supreme Court considered whether state income taxes could be imposed on out-of-state franchisors who earned income based on franchise activities within the state. *Id.* at 15. In concluding that a state had such power, the *Geoffrey* court relied upon the notion that intangible property acquired a "business situs" in a state where it is used by a local business. *Id.* at 18–19; *see also Wheeling Steel Corp. v. Fox,* 298 U.S. 193, 210, 56 S. Ct. 773, 777, 80 L. Ed. 1143, 1148 (1936). Further, the *Geoffrey* court cited *International Harvester* for the proposition that a state may impose a tax on

> such part of the income of a non-resident as is fairly attributable either to property located in the state or to events or transactions which, occurring there, are within the protection of the state and entitled to the numerous other benefits which it[] confers.

*Geoffrey*, 437 S.E.2d at 18 (citing *Int'l Harvester*, 322 U.S. at 441–42, 64 S. Ct. at 1063–64, 88 L. Ed. at 1379).

As an alternative ground, the *Geoffrey* court, in summary fashion, concluded that the physical presence requirement of *Bellas Hess* and *Quill* was not required. *Id.* According to *Geoffrey*, "any corporation that regularly exploits the markets of a state should be subject to its jurisdiction to impose an income tax even though not physically present." *Id.*; *see* I Jerome R. Hellerstein & Walter Hellerstein, *State Taxation* ¶ 6.11, at 6-54 to -83 (3d ed. 2006). Further, the *Geoffrey* court concluded that the presence of intangible property of the taxpayer within the state was a sufficient nexus to support the imposition of state income taxes under the Commerce Clause. *Geoffrey*, 437 S.E.2d at 18.

While the reasoning of *Geoffrey* has been criticized as cursory and conclusory, *see* Richard H. Kirk, Note, *Supreme Court Refuses to Re-Examine Whether Physical Presence is a Prerequisite to State Income Tax Jurisdiction:* Geoffrey, Inc. v. South Carolina Tax Commission, 48 Tax Law. 271, 276 (1994), the result has been embraced by other state courts considering whether the licensing of intangible property, such as trademarks and business methods, for use within a state provides a sufficient nexus for income taxation. For example, in *A & F Trademark*, the court emphasized that the language of *Quill* is cramped and limiting, that *Quill* was driven largely by considerations of stare decisis that were inapplicable outside the sales and use tax context, and that the burdens of sales and use taxes are more substantial than other taxes, such as state income taxes. *A & F Trademark*, 605 S.E.2d at 194–95; *see also Comptroller of the Treasury v. SYL, Inc.*, 825 A.2d 399, 416–17 (Md. 2003) (citing *Geoffrey* with approval); *Lanco, Inc. v. Dir., Div. of Taxation*, 908 A.2d 176, 177 (N.J. 2006), *cert. denied*, 551 U.S. 1131 (2007)

(interpreting *Quill* narrowly and noting that the *Quill* Court "carefully limited its language to a discussion of sales and use taxes").

A number of state courts have gone even further than the cases dealing with intangible property and have held that even banking transactions within a state satisfy the nexus demands of the Commerce Clause for purposes of imposition of state taxes other than those on sales and use. *See Capital One Bank v. Comm'r of Revenue*, 899 N.E.2d 76, 84–87 (Mass. 2009) (adopting flexible economic substance analysis rather than physical presence test in context of financial institution excise taxes); *Tax Comm'r v. MBNA Am. Bank, N.A.*, 640 S.E.2d 226, 234–36 (W. Va. 2006) (adopting an economic presence analysis in context of franchise and income taxes). These cases represent the frontier of state assertions of nexus to tax out-of-state entities in contexts other than sales or use taxes.

While most state courts limit *Quill* to the specific context of sales and use taxes, a few state court cases seem more sympathetic to applying *Quill* outside the sales and use tax context. In *Johnson*, the Tennessee Court of Appeals considered the validity of franchise and excise taxes imposed against an out-of-state corporation engaged in credit card activities within the taxing jurisdiction. *Johnson*, 19 S.W.3d at 832. While there is language in *Johnson* that indicated there was no basis for distinguishing between sales and use taxes and the franchise and excise taxes involved in the case, the court declined to determine "whether 'physical presence' is required under the Commerce Clause." *Id.* at 842. A subsequent unpublished opinion of the same court expresses doubt on the issue. *See Am. Online, Inc. v. Johnson*, No. M2001-00927-COA-R3-CV, 2002 WL 1751434, at *2 (Tenn. Ct. App. July 30, 2002). Further, it is not clear how the *Johnson* court would have

treated a case involving use of intellectual property such as trade names and trademarks, which arguably have a stronger nexus to the host jurisdiction than credit cards and other lending transactions.

In *Rylander v. Bandag Licensing Corp.*, 18 S.W.3d 296 (Tex. App. 2000), the court considered the validity of a tax based solely on the taxpayer's possession of a license to do business in Texas. *Rylander*, 18 S.W.3d at 298. As in *Johnson*, the court noted that it saw no principled basis for distinguishing between the sales and use taxes and other types of state taxes. *Id.* at 299–300. The court, however, did not consider whether income taxes could be imposed on an out-of-state corporation from income related to royalty payments arising from the licensing of intangibles. *See id.*

On the precise issue of whether licensing of intangibles for use in a state that produces income within a state for an out-of-state corporation is subject to income tax, the weight of state authority is that it does, either on the ground that physical presence has been satisfied or that the physical presence requirement does not apply outside the context of sales or use taxes. In both *Bellas Hess* and *Quill*, however, the Supreme Court reversed judgments of state supreme courts that expansively applied the "substantial nexus test" of *Complete Auto* through an economic impact analysis. Further, it might be argued that state supreme courts are inherently more sympathetic to robust taxing powers of states than is the United States Supreme Court.

**D. Analysis of Constitutionality Under Dormant Commerce Clause of State Income Tax Assessments in this Case**.

1. *Introduction.* At the outset, it is important to identify our task in this case. Our function is to determine, to the best of our ability, how the United States Supreme Court would decide this case under its case

law and established dormant Commerce Clause doctrine. In performing this task, we do not engage in independent constitutional adjudication, and we do not seek to improve or clarify Supreme Court doctrine. We simply do our best to predict how the Supreme Court would decide the issues presented in this case.

Based upon our analysis of the above authorities and our understanding of the underlying constitutional purposes of the dormant Commerce Clause, we conclude that the district court, in light of the available Supreme Court precedents, adopted a sound approach when it held that the dormant Commerce Clause is not offended by the imposition of Iowa income tax on KFC's royalties earned from the use of its intangibles within the State of Iowa. We reach this conclusion for the reasons expressed below.

2. *Application of* Quill *"physical presence" test to use of intangible property to revenue within a state for an out-of-state entity.* We first consider whether the *Quill* "physical presence" test is satisfied in this case. Unlike in *Quill*, where the only presence in the state, except for "title to 'a few floppy diskettes,'" resulted from the use of United States mail and common carriers, this case involves the use of KFC's intangible property within the State of Iowa to produce royalty income for KFC. *See Quill*, 504 U.S. at 315 n.8, 112 S. Ct. at 1914 n.8, 119 L. Ed. 2d at 108 n.8.

The United States Supreme Court has not considered this precise question post-*Quill*. In *Quill*, the majority dismissively referred to the vendor's "title to 'a few floppy diskettes'" but recognized that the diskettes "might constitute some minimal nexus." *Id.* Apparently, the Court believed that the minimal physical presence presented by title to a

few floppy diskettes was not "substantial" enough to satisfy *Complete Auto. See id.*

Here, however, the nexus presented by the use of KFC's intangible property within the State of Iowa strikes us as far more than title to a few floppy diskettes. In this case, KFC has licensed its valuable intellectual property for use within the geographic boundaries of the State of Iowa to produce income. This case thus does not involve the arguably "slightest presence" of intangible property within Iowa, but a far greater involvement with the forum state.

Under the applicable pre-*Quill* case law, the use of intangibles within a state to generate revenue for an out-of-state entity was generally regarded as a sufficient nexus under the dormant Commerce Clause to support the imposition of a state income tax. For instance, in *Whitney*, noted above, the Court upheld a Commerce Clause challenge to the taxation of profits made from the sale of a seat on the New York Stock Exchange. *Whitney*, 299 U.S. at 374, 57 S. Ct. at 239, 81 L. Ed. at 289. Although the taxpayer had no physical presence in New York, the Court reasoned intangibles may be sufficiently localized "to bring it within the taxing power" of the state. *Id.* We view the intangibles in this case to be sufficiently "localized" under *Whitney* to provide a "business situs" sufficient to support an income tax on revenue generated by the use of the intangibles within Iowa. *See id.*; *see also Mobil Oil Corp. v. Comm'r of Taxes*, 445 U.S. 425, 445–46, 100 S. Ct. 1223, 1235–36, 63 L. Ed. 2d 510, 526 (1980) (holding intangibles may be located in more than one state depending upon their use); *Wheeling Steel Corp.*, 298 U.S. at 213–14, 56 S. Ct. at 778–79, 80 L. Ed. at 1149–50 (1936) (concluding that accounts receivable and bank deposits have business situs in host state); Sheldon H. Laskin, *Only a Name? Trademark Royalties, Nexus, and*

*Taxing That Which Enriches*, 22 Akron Tax J. 1, 16–21 (2007) [hereinafter Laskin].

Similarly, the presence of transactions within the state that give rise to KFC's revenue provide a sufficient nexus under established Supreme Court precedent. In *International Harvester,* the Court considered whether Wisconsin could impose an income tax on dividends received by out-of-state stockholders. *Int'l Harvester,* 322 U.S. at 438, 64 S. Ct. at 1062, 88 L. Ed. at 1377. The Court concluded that personal presence within the state is not essential, and that:

> A state may tax such part of the income of a non-resident as is fairly attributable either to property located in the state *or to events or transactions* which, occurring there, are subject to state regulation and which are within the protection of the state and entitled to the numerous other benefits which it confers.

*Id.* at 441–42, 64 S. Ct. at 1064, 88 L. Ed. at 1379 (emphasis added); *see also Curry v. McCanless*, 307 U.S. 357, 368, 59 S. Ct. 900, 906, 83 L. Ed. 1339, 1348 (1939) (reasoning that income may be taxed on the basis of source as well as residence); *Shaffer v. Carter*, 252 U.S. 37, 57, 40 S. Ct. 221, 227, 64 L. Ed. 445, 458–59 (1920) (same); Jerome R. Hellerstein & Walter Hellerstein, *State and Local Taxation: Cases and Materials* 368–69 (7th ed. 2001) [hereinafter Hellerstein & Hellerstein, *State and Local Taxation*] (citing *Curry*, 307 U.S. at 368, 59 S. Ct. at 906, 83 L. Ed. at 1348).

As a result, we conclude that the Supreme Court would likely find intangibles owned by KFC, but utilized in a fast-food business by its franchisees that are firmly anchored within the state, would be regarded as having a sufficient connection to Iowa to amount to the functional equivalent of "physical presence" under *Quill.* Furthermore, the fact that the transactions that produced the revenue were based upon use of the

intangibles in Iowa also provides a sufficient basis to support the tax under the Commerce Clause.

3. *Extension of "physical presence" nexus requirement to state taxation of income based on use of intangibles within forum state.* In the alternative, even if the use of intangibles within the state in a franchised business does not amount to "physical presence" under *Quill*, the question arises whether the Supreme Court would extend the *Quill* "physical presence" requirement to prevent a state from imposing, on out-of-state residents, an income tax based on revenue generated from the use of intangibles within the taxing jurisdiction. For the reasons expressed below, we do not believe the Supreme Court would extend the rule beyond its established moorings in *Quill*.

The lynchpin of the Supreme Court's opinion in *Quill* was not logic, or the developing Commerce Clause jurisprudence, but stare decisis. *See Quill*, 504 U.S. at 317, 112 S. Ct. at 1915–16, 119 L. Ed. 2d at 109–10. The prior *Bellas Hess* standard created an incentive for consumers to purchase goods from an out-of-state entity, an incentive which in turn contributed to the dramatic growth of the mail-order business. *See* Michael T. Fatale, Geoffrey *Sidesteps* Quill*: Constitutional Nexus, Intangible Property and the State Taxation of Income*, 23 Hofstra L. Rev. 407, 409–10 (1994) [hereinafter Fatale]. The *Quill* Court was unwilling to upset the settled expectations of a huge mail-order industry after its growth was spawned by a prior court decision. *See Quill*, 504 U.S. at 316, 112 S. Ct. at 1915, 119 L. Ed. 2d at 109. Despite this, the Supreme Court repeatedly recognized that the tides of due process and Commerce Clause jurisprudence tugged strongly in the opposite direction and that the issue may have been decided differently if it was one of first impression. *Id.* at 311, 112 S. Ct. at 1912, 119 L. Ed. 2d at 105.

Further, it appears that the Court may have been concerned about the potential of retroactive application if *Bellas Hess* were reversed. *See id.* at 318 n.10, 112 S. Ct. at 1916 n.10, 119 L. Ed. 2d at 110 n.10. This prospect may have been particularly daunting in *Quill,* as a reversal of *Bellas Hess* could have created a huge tax liability imposed upon out-of-state vendors for their failure to collect sales and use taxes owed by others. Here, however, there is no vicarious liability for taxes that should have been imposed on third parties. Instead, in the income-tax context, the tax is either owed by the taxpayer or it is not. *See* 2 Paul J. Hartman & Charles A. Trost, *Federal Limitations on State & Local Taxation 2d* § 10:7, at 12–13 (Supp. 2010).

In this case, there is simply no similar reliance interest. With respect to state taxation of income whose source is the employment of intangibles within the taxing jurisdiction, there is simply no *Bellas Hess* precedent that gives rise to reliance interests. As demonstrated by the income-tax nexus cases discussed above, the majority in *Quill* correctly noted that "we have not, in our review of other types of taxes, articulated the same physical-presence requirement that *Bellas Hess* established for sales and use taxes." *Quill,* 504 U.S. at 314, 112 S. Ct. at 1914, 119 L. Ed. 2d at 108. To the extent there are any antecedents for state income taxes, they are *International Harvester* and *Whitney,* which do not require physical presence. Although these cases are due process cases, they were decided at a time when the nexus requirements of the Due Process Clause and the dormant Commerce Clause were thought to be interchangeable.

In addition, the Supreme Court in *Quill* sought to defend its Commerce Clause based physical-presence test with a burdens-type analysis, noting that if a state could be required to collect and remit use

taxes, it might be required to comply with potentially differing requirements in 6000 or more jurisdictions. *Id.* at 313 n.6, 112 S. Ct. at 1914 n.6, 119 L. Ed. 2d at 107 n.6. The burden of state income taxation, however, is substantially less when far fewer jurisdictions are involved, when the taxpayer does not become a virtual agent of the state in collecting taxes from thousands of individual customers, and when tax assessments are only made periodically. Indeed, in cases involving income taxes, the Court has not seemed overly concerned with the compliance burdens. *See Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298, 313–14, 114 S. Ct. 2268, 2277–78, 129 L. Ed. 2d 244, 259–60 (1994); *Nw. States Portland Cement Co.*, 358 U.S. at 462–63, 79 S. Ct. at 364–65, 3 L. Ed. 2d at 429–30.

Advocates of extension of the physical presence test to income taxes stress the potential burdens on small out-of-state sellers. A hypothetical often cited is the author of a book whose work is sold within a state where the author has never had a physical presence. To impose income tax on royalties earned by such a transaction, according to some, would be absurd.

The hypothetical fails for several reasons. First, slight presence in a state has never been held sufficient to establish a "substantial nexus" under the dormant Commerce Clause, and a truly *de minimus* economic presence by a book author should not be subject to tax. *See Nat'l Geographic Soc'y*, 430 U.S. at 556, 97 S. Ct. at 1390, 51 L. Ed. 2d at 637. Moreover, royalties earned by an author of a book are ordinarily paid by a publisher to the author, not by a local retailer. The income from a book deal thus arises out of the contract between the publisher and the author. The relationship between the publisher and the local retailer has no relevance for purposes of income taxation. *See* Fatale, 23

Hofstra L. Rev. at 450; Laskin, 22 Akron Tax J. at 25–26. Further, if states become overly aggressive in their tax policy, Congress has the express authority to intervene under the Commerce Clause.

We also doubt that the Supreme Court would extend the "physical presence" rule outside the sales and use tax context of *Quill.* The use of a "physical presence" test does, of course, limit the power of the state to tax out-of-state taxpayers, but it does so in an irrational way. For example, while in *Quill* the Court was concerned about the undue burden on interstate commerce caused by enforcement of sales and use taxes, "physical presence" within the state does not reduce that burden. *See* John A. Swain, *State Sales and Use Tax Jurisdiction: An Economic Nexus Standard for the Twenty-First Century*, 38 Ga. L. Rev. 343, 361–62 (2003) [hereinafter Swain]. Further, the "physical presence" test may protect small vendors, but it also protects large vendors who are not unduly burdened. *Id.* at 363.

In fact, "physical presence" in today's world is not "a meaningful surrogate for the economic presence sufficient to make a seller the subject of state taxation." *Id.* at 392. "Physical presence" often reflects more the manner in which a company does business rather than the degree to which the company benefits from the provision of government services in the taxing state. Does it really make sense to require Barnes and Noble to collect and remit use taxes, but not impose the same obligation on Amazon.com, based on the difference in their business methods? *See* H. Beau Baez III, *The Rush to the Goblin Market: The Blurring of* Quill*'s Two Nexus Tests*, 29 Seattle U. L. Rev. 581, 582 n.8 (2006) [hereinafter Baez]; Bradley W. Joondeph, *Rethinking the Role of the Dormant Commerce Clause in State Tax Jurisdiction*, 24 Va. Tax Rev. 109, 135 (2004).

It also seems that, to the extent the Court desired to achieve a "bright line," it may not have achieved its objective. As Justice White predicted in his separate opinion in *Quill*, the "physical presence" test has not put an end to dormant Commerce Clause litigation in the sales and use tax area. *Quill*, 504 U.S. at 329–30, 112 S. Ct. at 1921, 119 L. Ed. 2d at 118. *Quill* clearly established that a small sales force, plant, or office is enough to satisfy the nexus test under the dormant Commerce Clause. *See id.* at 315, 112 S. Ct. at 1914–15, 119 L. Ed. 2d at 108. Nevertheless, the question of how much "physical presence" is required to establish a "substantial nexus" has still proven problematic. *Compare Orvis Co. v. Tax Appeals Tribunal*, 654 N.E.2d 954, 961 (N.Y.) (holding that occasional traveling personnel entering jurisdiction is sufficient), *cert. denied sub nom. Vt. Info. Processing, Inc. v. Comm'r*, 516 U.S. 989 (1995), *with Johnson*, 19 S.W.3d at 840 & n.18 (reasoning that physical presence of thousands of credit cards was "constitutionally insignificant"). Many other cases grapple with the question of what amounts to sufficient physical presence to satisfy *Quill*.[1] *See* Hellerstein & Hellerstein, *State and Local Taxation* at 352–54 (citing cases); *see also* Baez, 29 Seattle U. L. Rev. at 595–600; Matthew T. Troyer, Note, *Mail Order Retailers and Commerce Clause Nexus: A Bright Line Rule or an Opaque Standard?*, 30 Ind. L. Rev. 881, 897 (1997) (asserting " '[s]ubstantial nexus' is too vague to function as a bright-line rule").

---

[1]In a pre-*Quill* case, we grappled with the problem of physical presence when an Illinois retailer's contact with Iowa was incidental general advertising and occasional deliveries via employee-driven, company-owned trucks. *Good's Furniture House, Inc. v. Iowa State Bd. of Tax Review*, 382 N.W.2d 145, 146–47 (Iowa), *cert. denied*, 479 U.S. 817 (1986). We concluded that the requisite physical presence under *Bellas Hess* was established. *Id.* at 150. Our ruling was criticized for eroding the physical presence nexus standard. *See* Chris M. Amantea, *Use Tax Collection Jurisdiction: Retail Stores on a State Border Held Hostage*, 63 Chi.-Kent L. Rev. 747, 759–64 (1987).

There is also the difficult question of when the physical presence of third parties should be attributed to an out-of-state party for purposes of establishing a substantial nexus under *Complete Auto*. The cases are hardly uniform. *Compare Syms Corp. v. Comm'r of Revenue*, 765 N.E.2d 758, 766 (Mass. 2002) (precluding deduction from taxable income royalty payments made to a passive investment company), *with Sherwin-Williams Co. v. Comm'r of Revenue*, 778 N.E.2d 504, 518–19 (Mass. 2002) (permitting deduction from taxable income royalty payments made to a passive investment company). *See generally* Laskin, 22 Akron Tax J. at 7 n.24, 8–13.

Moreover, if a "bright line" test is needed in the income tax arena, it may not be physical location but something else, particularly when taxation is based upon the source of the income. For example, the three-factor formula behind the Uniform Division of Income for Tax Purposes Act has been called "something of a benchmark." *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 170, 103 S. Ct. 2933, 2943, 77 L. Ed. 2d 545, 556 (1983).

We also note that the *Quill* decision impliedly suggests a desire on the part of the Supreme Court to defer to Congress on most nexus issues. We find significant the holding of the *Quill* Court that the imposition of sales and use taxes by states on out-of-state residents who utilize only mail and common carriers did not violate due process. By removing the due process impediment to state taxation of mail-order sales when physical presence was lacking, the *Quill* Court opened the door to congressional action.

It seems clear that the *Quill* majority recognized that difficult issues of determining the extent to which the states should be allowed to impose tax obligations on comparatively remote entities was infused with

policy and legislative-type judgments that could not be resolved in the context of judicial determination of a particular case. Certainly Justice Scalia and Justice Thomas would not extend the line drawing under the dormant Commerce Clause outside what is required by stare decisis. *See, e.g., Am. Trucking Ass'ns v. Scheiner*, 483 U.S. 266, 304, 107 S. Ct. 2829, 2851, 97 L. Ed. 2d 226, 256 (1987) (Scalia, J., dissenting) (asserting judicial intervention under dormant Commerce Clause should be limited to cases involving discrimination against interstate commerce).

We recognize that a counterargument could be made that aggressive judicial intervention is required to prevent states from shifting tax burdens onto out-of-state parties who lack political power in the taxing jurisdiction. We question, however, whether out-of-state entities are as powerless in the halls of state legislatures as they once were in light of the growth of national advocacy groups that protect the local interests of their members and the involvement of national political parties in state political affairs. In addition, in this case, the in-state presence of franchisees, whose interest in tax matters are likely to be aligned with the franchisor, are well positioned to participate in the local political process. We further note that the mechanism to control any improper shifting of tax burdens onto out-of-state taxpayers is enforcement of the discrimination and apportionment prongs of *Complete Auto*, not the nexus requirement.

Another factor that suggests the physical-presence test should not be extended outside its sales and use tax confines is the potential for tax evasion that the test engenders. Obviously, this concern did not carry the day in *Quill*. But experience should be instructive; namely, the result in *Bellas Hess* created a huge loophole in the tax structure that, twenty-five years later was practically impossible to close. Further, extension of

the "physical presence" approach in *Quill* would be an incentive for entity isolation in which potentially liable taxpayers create wholly owned affiliates without physical presence in order to defeat potential tax liability. *See* Swain, 38 Ga. L. Rev. at 366–68. We doubt that the Supreme Court would want to extend such form-over-substance activity into the income tax arena where substance over form has been the traditional battle cry. *Scripto, Inc.,* 362 U.S. at 211, 80 S. Ct. at 622, 4 L. Ed. 2d at 664 (noting that to permit the fine distinction between employees and independent contractors to control the result of taxation under the Commerce Clause would "open the gates to a stampede of tax avoidance").

Finally, we think taxation of the income here is most consistent with the now prevailing substance-over-form approach embraced in most of the modern cases decided by the Supreme Court under the dormant Commerce Clause. When a company earns hundreds of thousands of dollars from sales to Iowa customers arising from the licensing of intangibles associated with the fast-food business, we conclude that the Supreme Court would engage in a realistic substance-over-form assessment that would allow a state legislature to require the payment of the company's fair share of taxes without violating the dormant Commerce Clause.

For the above reasons, we hold that a physical presence is not required under the dormant Commerce Clause of the United States Constitution in order for the Iowa legislature to impose an income tax on revenue earned by an out-of-state corporation arising from the use of its intangibles by franchisees located within the State of Iowa. We hold that, by licensing franchises within Iowa, KFC has received the benefit of an orderly society within the state and, as a result, is subject to the

payment of income taxes that otherwise meet the requirements of the dormant Commerce Clause. As a result, the district court judgment on the dormant Commerce Clause issues in this case is affirmed.

**IV. State Law Claims.**

**A. State Law Claim Under Iowa Code Section 422.33.** In the alternative to its constitutional attack under the dormant Commerce Clause, KFC argues that the imposition of tax in this case is not authorized by the provisions of Iowa law and related administrative regulations that authorize the imposition of income tax on corporations because of the lack of physical presence within Iowa.

We do not agree. The applicable provision of the Code, Iowa Code section 422.33(1) (1997), imposes an income tax on each corporation "doing business in this state, or deriving income from sources within this state." Iowa Code § 422.33(1). Iowa Code section 422.33(1) further provides that "income from sources within the state" includes "income from real, tangible, or intangible property located or having a situs in the state." *Id.* § 422.33(1)(*d*). The reference to "intangible property" located or "having a situs in the state" is a clear reference to the applicable case law dealing with taxation of income arising from the use of intangibles in connection with transactions within a state. *See, e.g., Nw. States Portland Cement Co.,* 358 U.S. at 464–65, 79 S. Ct. at 365–66, 3 L. Ed. 2d at 430–31; *Int'l Harvester,* 322 U.S. at 442, 64 S. Ct. at 1064, 88 L. Ed. at 1379–80; *Whitney,* 299 U.S. at 371–72, 57 S. Ct. at 238, 81 L. Ed. at 287–88. Therefore, the tax at issue in this case falls squarely within the intended scope of Iowa Code section 422.33.

This interpretation is not diminished by, nor is there anything invalid about, the administrative regulations promulgated pursuant to the statute. IDOR has promulgated regulations implementing Iowa Code

section 422.33(1). Under the applicable rules, the statutory phrase "intangible property located or having a situs in this state" is further defined to include intangible property that "has become an integral part of some business activity occurring regularly in Iowa." Iowa Admin. Code r. 701—52.1(1)(*d*), (4) (1997). Citing *Geoffrey*, the rules specifically provide that, if a corporation owns trademarks and trade names that are used in Iowa, a business situs for purposes of taxation may be present even though the corporation has no physical presence or other contact with Iowa. *See* Iowa Admin. Code r. 701—52.1(4) (Example 4); *see also Geoffrey*, 437 S.E.2d at 18–19. The administrative regulations are simply a logical interpretation of the statute with citation to the evolving case law on the taxation of revenues earned or arising out of intangible property.

**B. Other State Law Claims.** KFC raises two other state law claims on appeal. First, it claims that a policy letter issued by IDOR is contrary to the position IDOR has taken in this case and that IDOR has not provided an adequate explanation for its departure from its established policy. Second, KFC claims that IDOR erred by assessing penalties against KFC for its failure to pay the asserted taxes.

Neither of these issues, however, has been preserved for our review. KFC claims that the issues were properly raised before the agency. Even if the issues were properly raised before the agency, KFC was required to file a motion for rehearing under Iowa Code section 17A.16(2) (2009) to preserve the issues when the agency issued a final order that did not address them. This KFC did not do. As a result, when KFC filed its appeal of the administrative action with the district court, there was no ruling on the policy letter or penalty issues for the district court to review.

When an agency fails to address an issue in its ruling and a party fails to point out the issue in a motion for rehearing, we find that error on these issues has not been preserved. Our respect for agency processes in administrative proceedings is comparable to that afforded to district courts in ordinary civil proceedings. Just as we do not entertain issues that were not ruled upon by the district court and that were not brought to the district court's attention through a proper posttrial motion, *Meier v. Senecaut*, 641 N.W.2d 532, 540 (Iowa 2002), we decline to entertain issues not ruled upon by an agency when the aggrieved party failed to follow available procedures to alert the agency of the issue. *See Soo Line R.R. v. Iowa Dep't of Transp.*, 521 N.W.2d 685, 688 (Iowa 1994) (stating that the scope of administrative review is limited to questions that were actually considered by the agency); *Chi. & Nw. Transp. Co. v. Iowa Transp. Regulation Bd.*, 322 N.W.2d 273, 276 (Iowa 1982) (finding that an issue first raised in motion for rehearing and considered by the agency is preserved); *Charles Gabus Ford, Inc. v. Iowa State Highway Comm'n*, 224 N.W.2d 639, 647 (Iowa 1974) (discussing requirement of exhaustion of administrative remedies when agency has primary or exclusive jurisdiction over controversy).

**V. Conclusion.**

For the above reasons, we conclude that the assessment of income tax liability made by IDOR against KFC does not violate the dormant Commerce Clause or any provision of Iowa law. We further conclude that the issues related to the policy letter and the assessment of penalties have not been preserved. As a result, we affirm the judgment of the district court upholding the action of IDOR in all respects.

**AFFIRMED.**

All justices concur except Wiggins, J., who concurs in result.